ENERGY RESERVES GROUP, INC., and Suburban Propane Gas Corporation, Plaintiffs,

Marathon Oil Company and Sklar & Phillips Oil Company, Intervening Plaintiffs,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Federal Energy Administration, Defendants.

SIERRA PETROLEUM CO., INC., Plaintiff,

Maurice L. Brown Company, Intervening Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Federal Energy Administration, defendants.

BRADEN–ZENITH, INC., Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Federal Energy Administration, Defendants.

Civ. A. Nos. 77–1146, 77–1087, 76–429–C6.

United States District Court, D. Kansas.

Jan. 26, 1978.

Joseph W. Kennedy of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for Energy Reserves Group, Inc., Suburban Propane Gas Corp., and Sklar & Phillips Oil.

Martin, Pringle, Schell & Fair, Paul B. Swartz, Wichita, Kan., for Energy Reserves Group, Inc.

Arthur M. Meyer, Jr., John R. Cope of Bracewell & Patterson, Washington, D. C., for Sklar & Phillips Oil Co.

John M. Shuey, Shuey, Smith & Carlton, Shreveport, La., Warren E. Connelly of Marathon Oil, Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., for Marathon Oil.

Robert F. Ochs, The Gulf Companies, Law Dept., Houston, Tex., for Gulf Co.

Richard D. Greene, Robert I. Guenthner of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for Sierra Petroleum Co.

Robert I. Guenthner of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for Braden-Zenith, Inc.

Robert G. Hiess, Federal Energy Administration, Barbara Allen Babcock, Asst. Atty. Gen., C. Max Vassanelli, Economic Litigation Section, Rex E. Lee, Linda L. Pence, Stanley D. Rose, Gwynn T. Swinson, Civ. Div., U. S. Dept. of Justice, Washington, D. C., Jon K. Sargent, Asst. U. S. Atty., Topeka, Kan., for defendants.

## OPINION OF THE COURT

THEIS, District Judge.

The plaintiffs and intervenors in this action are operators and owners of interests in properties capable of producing crude oil economically only by means of waterflood operations. Defendant Federal Energy Administration (FEA) is an agency of the United States, organized and existing under the provisions of the Federal Energy Administration Act of 1974, 15 U.S.C. § 761, et seq., and Executive Order No. 11790 (39 Fed.Reg. 2385, June 25, 1974). Defendant John O'Leary is named herein in his official capacity as Administrator of the FEA and references henceforth to FEA are intended to include both the FEA and its Administrator. Plaintiffs filed this action requesting declaratory judgment and injunctive relief invalidating a certain Ruling and Regulations of the FEA under which the FEA forbids counting of injection wells as wells for purposes of determining stripper lease status.

On May 26, 1977, a hearing on Motion for Preliminary Injunction in Civil Action No. 77–1146 was conducted before the Court and a preliminary injunction issued. These three cases were thereafter consolidated for the purpose of deciding three common issues:

1. Whether Ruling 1974–29 issued by the FEA on December 24, 1974, 39 Fed. Reg. 44414 is arbitrary, unreasonable or in conflict with its statutory authority.

2. Whether Rule 1974–29 was issued by the FEA in compliance with the Administrative Procedure Act, 5 U.S.C. § 553.

3. If Ruling 1974–29 is valid, whether the ruling may be applied to the plaintiffs' sales of crude oil prior to December 24, 1974, the date on which the ruling was issued.

All parties have filed Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and hearing upon such motions was held to the Court. The parties agree there are no issues of material fact before the Court as to the questions outlined above, although de-

fendant correctly asserts the Court cannot at this time determine any issue of good or bad faith on the part of plaintiffs as related to the issue of retroactive enforcement. The statutory and regulatory history and other relevant undisputed facts as presented by the parties in briefs and argument before the Court are set out below.

### FACTUAL BACKGROUND AND FINDINGS

Prior to November 16, 1973, a regulation issued by the Cost of Living Council (CLC) pursuant to the Economic Stabilization Act of 1970, placed a ceiling price on the first sale of domestic crude petroleum.

On November 16, 1973, Congress enacted the Trans-Alaska Pipeline Authorization Act (TAPAA) which, inter alia, exempted from price controls the first sale of "crude oil . . . produced from any lease whose average daily production of such substances for the preceding calendar month does not exceed ten barrels per well . .." P.L. 93–153, § 406(a), 87 Stat. 584, 590.

The Conference Report which accompanied TAPAA reads in part:

Section 406, relating to stripper oil wells, as a Senate floor amendment to S.1081. The Conferees have adopted the general concept of the floor amendment, but have added new provisions to insure that the exemption is narrowly defined and prudently administered, and to insure that the incentive being granted is properly limited in accord with congressional intent.

The purpose of exempting small stripper wells—wells whose average daily production does not exceed ten barrels per well—from the price restraints of the Economic Stabilization Act . . . and from any system of mandatory fuel allocation is to insure that direct or indirect price ceilings do not have the effect of resulting in any loss of domestic crude oil production from the premature shutdown of stripper wells for economic reasons.

As of January 1, 1973, there were 350,000 stripper wells producing ten barrels a day or less. Stripper wells account for 71 percent of all of the oil wells in this country, but produce an average of only 3.6 barrels per day, or only 13 percent of total U.S. domestic crude production.

Many stripper wells are of only marginal economic value. When the costs of their operation exceed the value of their production, they are shut in, and a known and developed crude oil reserve is lost to U.S. production. Removing Phase IV price restraints from these marginal stripper wells has the effect of increasing the value of the crude oil they produce by about $1.30 per barrel. . . . This price incentive will encourage owners and operators of stripper wells to maintain production and to keep these wells in operation for longer periods of time than would be possible if the value of their crude oil production were determined under Phase IV price ceilings. This increased incentive will, it is anticipated, permit stripper well operators to make new investments in the eligible wells and improve the gathering and other facilities for moving this oil to market. 2 U.S. Cong. & Admin.News, pp. 2531–32 (1973).

The provisions added by the Conference Committee to insure the exemption is narrowly defined include on-site inspections and use of State data to prevent "gerrymandering" of leases. The Committee added:

The *sole* purpose and objective of this Section 406 is to keep stripper wells— those producing less than ten barrels per day—in production and to insure that the crude oil they produce continues to be available for U.S. refineries and U.S. consumers. (Id. at 2532.)

On November 26, 1973, the CLC published regulations exempting from price controls the first sale of domestic crude petroleum and petroleum condensates produced from any "stripper well." 6 C.F.R. § 150.-54(s). The CLC also issued regulations defining "stripper well lease," 6 C.F.R. § 150.54(s)(2), and the statutory term "average daily production." 6 C.F.R. § 150.-54(s)(2).

On November 27, 1973, Congress enacted the Emergency Petroleum Allocation Act (EPAA) requiring the President to promulgate regulations providing for, inter alia, pricing of crude oil not later than fifteen days after the date of enactment. Section 4(e)(2)(A) of the EPAA preempted the counterpart provision in the TAPAA, and provided:

> The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well. 15 U.S.C. § 753(e)(2)(A) (1973).

On December 6, 1973, by Executive Order 11748 (38 Fed.Reg. 33575), the President created the Federal Energy Office (FEO) and delegated to it his authority under the EPAA.

On December 14, 1973, the CLC published a stripper well lease exemption amended to conform to the EPAA statutory terms. The new definition of stripper well lease was set out as follows:

> A "property" whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed 10 barrels per day during the preceding calendar year. 6 C.F.R. § 150.54(s)(2).

The amended regulatory definition of the statutory term "average daily production" was set out as follows:

> The qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of calendar days in that year times the number of wells which produced crude petroleum and petroleum condensates, including natural gas liquids, from that property in that year.
>
> To qualify as a maximum total production each well on the property must have been maintained at the maximum feasible rate of production, in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanical failure or other disruption in production. 6 C.F.R. § 150.54(s)(2).

On December 26, 1973, the CLC delegated its petroleum pricing authority to the FEO and on January 14, 1974, FEO adopted and reissued the CLC definitions of "stripper well lease" and "average daily production." 10 C.F.R. § 210.32(b).

On June 27, 1974, pursuant to the FEA Act and Executive Order No. 11790, authority with respect to price controls on crude oil was transferred to the FEA. The regulations set forth and discussed in preceding paragraphs remained in effect as regulations of the FEA.

On December 19, 1974, the FEA issued Ruling 1974–29, 30 Fed.Reg. 44414, relevant portions of which are set out below:

> *Issue*: Is an "injection" well a "well" for the purpose of determining whether the average daily production of a property was 10 barrels or less per well in the preceding calendar year, for purposes of the stripper well lease exemption of 10 C.F.R. § 210.32?
>
> *Ruling*: No. Under the FEA regulations, the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from any stripper well lease is exempt from the mandatory price and allocation regulations. A stripper well lease is defined as a property whose average daily production did not exceed 10 barrels per day per well during the preceding calendar year. "Average daily production" is further defined in 10 C.F.R. § 210.32(b) as:
>
> > The qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of days in that year times the number of wells which produced crude petroleum and petroleum condensates, including natural gas liquids from that property in that year.

Thus, the FEA regulations by their specific language provide that only wells "which produce crude petroleum" are to be counted in calculating average daily production for the purpose of determining whether the stripper well lease exemption applies. While injection techniques help to "produce" crude petroleum, they are not wells which themselves "produce" crude petroleum. Therefore, wells which did not actually yield or produce crude petroleum during the preceding calendar year are not production wells for this purpose. Whether the non-producing well was an "injection" well, a disposal well, a dry well, a spent well, or a shut-in well will not change this result.

Ruling 1974–29 was issued by FEA General Counsel without prior notice or opportunity for comment by oil producers, and is based solely upon general counsel's understanding of specific language in FEA regulation at 10 C.F.R. § 210.32(b).

During early 1975, the FEA determined the stripper well lease definition contained in 10 C.F.R. § 210.32(b) discouraged increased production from marginally producing wells:

> Because the current regulation affords an exemption only in the year following a calendar year in which production from the lease was at or below the statutory stripper well level of ten barrels or less per well per day, there exists no incentive for producers to increase production levels above the ten barrel per well per day limit either through work-overs or enhanced recovery techniques, because such increased per-well production for a calendar year would then result in a loss of the stripper well lease exemption in the following year.

> .    .    .    .    .

> [I]f continued, the regulation would have the effect of seriously discouraging the implementation of enhanced recovery techniques on marginally-producing properties that are now subject to primary production techniques. (40 F.R. 22123, May 21, 1975.)

Accordingly, following notice of rulemaking and a public hearing, FEA adopted an amendment to the regulations which redefined stripper well lease as:

> A "property" whose average daily production of crude oil, including condensates, per well did not exceed 10 barrels per day during any preceding calendar year beginning after December 31, 1972. 10 C.F.R. § 210.32(b).

On December 22, 1975, Congress enacted the Energy Policy and Conservation Act (EPCA), P.L. 94–163, 42 U.S.C. § 6201, et seq., 15 U.S.C. § 753, et seq., which, inter alia, repealed the exemption from price controls for stripper well production. Pursuant to authority contained in the EPCA, the FEA included stripper well production in the upper tier pricing rule at 10 C.F.R. § 212.74, 41 Fed.Reg. 4931 (Feb. 3, 1976).

On August 14, 1976, Congress enacted the Energy Conservation and Production Act (ECPA), P.L. 94–385, 42 U.S.C. § 6801 (note) and 15 U.S.C. § 761 (note). Section 121 of the ECPA amended Section 8 of the EPAA by adding subsection (i), which reads in pertinent part as follows:

> Section 8(i)(1). The first sale price of stripper well crude oil shall be exempt from the regulation promulgated under section 4 of this Act [price controls] as amended pursuant to the requirements of this section.    .    .    .

> (2) For the purposes of this subsection "stripper well crude oil" means crude oil produced and sold from a property whose maximum average daily production of crude oil well during any consecutive 12-month period beginning after December 31, 1972, does not exceed 10 barrels.

> (3) To qualify for the exemption under this subsection, a property must be producing crude oil at the maximum feasible rate throughout the 12-month qualifying period and in accordance with recognized conservation practices.

> (4) The President may define terms used in this subsection consistent with the purposes thereof.

> 15 U.S.C. § 757(i)(1), (2), (3) and (4).

The Conference Report accompanying the ECPA provision above, stated:

Prior to the enactment of EPCA, stripper well production was free from federal crude oil price controls. The resulting imposition of price ceilings upon stripper well production has increased the administrative and compliance burdens associated with the implementation of EPCA. Imposition of federal price ceilings on stripper well operators—largely small and independent producers—has required them to comply with federal regulations, adding to the cost and administrative difficulties of operating these already marginal wells. These administrative, enforcement and compliance burdens may be unnecessary because, while 70 percent of all domestic wells are stripper, stripper well production accounts for only 12–15 percent of actual production. In addition, stripper well production is already priced at the upper tier. The conferees believe that exemption of stripper well production from price ceiling is desirable to reduce the burdens and costs imposed upon stripper well operators, as well as the administrative and compliance costs associated with implementation of EPCA. Equally importantly, the price increases permitted by such an exemption are likely to permit continued operation of marginally profitable stripper wells beyond the period which would be possible at current price levels. 3 U.S.Cong. & Admin.News, p. 2034 (1976).

On November 3, 1976, after public hearing and consideration of written comments, the FEA adopted without comment a regulation concerning stripper well exemption at 10 C.F.R. § 212.54, and a definition of "average daily production" virtually identical in pertinent parts to prior regulations issued in conjunction with TAPAA and EPAA. The FEA presently contends Ruling 1974–29 is applicable to determinations of the stripper well exemptions under TAPAA, EPAA and the EPCA.

Crude oil production is historically regulated by State bodies having as a primary purpose the elimination of waste in the production of oil and gas and the promulgation and enforcement of rules and regulations which result in conservation of oil and gas.

State regulatory agencies have treated injection wells as producing wells in calculating allowables, i. e., production quotas per well in pooled or unitized properties. The Oil Conservation Commission of the State of New Mexico specifically sanctioned the transfer of allowables from injection wells to recovery wells on one of the properties involved in the action. The Commissioner of Conservation for the State of Louisiana has also permitted the counting of injection wells to calculate allowables for poolwide units. The Railroad Commission of Texas has likewise permitted transfer of allowables from injection wells to recovery wells, has required counting of injection wells on well status reports filed with the Commission, and has permitted the counting of injection wells in the counting of wells for allowable purposes.

The Mineral Land Leasing Act of 1920 (MLLA), 30 U.S.C. § 181, et seq., authorized the execution of oil and gas leases by the Secretary of the Interior on federal lands at royalties to be determined by the Secretary on competitive bidding, and further provided the Secretary could reduce the royalty when the average daily production of any oil well did not exceed ten barrels per day. The Act was later modified to allow for the Secretary's approval and still later his requirement of cooperative or unit plans of development. In 1936 the Department of Interior regulations were amended to comply with such changes. In these regulations, the Secretary found input or injection wells to be commercially productive wells for purposes of calculating average daily production of a lease. Since 1936, the Secretary of the Interior has consistently included injection wells in a well count for purposes of determining "average daily production of any oil well," as set out in the statute. See 30 C.F.R. § 221.49.

During World War II, in order to provide additional incentive for marginal stripper well and repressuring operations, the Office of Economic Stabilization allowed a specified increased price in all pools producing less than nine barrels daily per well. 9

Fed.Reg. 7765 (1944). In applying this regulation, entitled "stripper well compensatory adjustment," the Price Administrator calculated "daily average per well production" by including both recovery and injection wells.

As oil is produced from a field under primary production, natural reservoir energy and pumping units are sufficient for economical production of oil. As oil is depleted, pressure lessens and lesser amounts of oil are forced to the surface. The economic limit for primary production is reached when revenues from oil produced equal the costs of production. At that time the operation will either shut down or go into a form of secondary recovery. One of the most common secondary recovery methods is use of injection wells in a waterflood operation.

All of the properties involved herein use wells through which water is injected into the producing geological formation for the purpose of creating water pressure in the formation, thereby driving the remaining crude oil to other wells from which the oil is recovered. Physically, the injected water displaces oil in the formation and supplies the necessary energy to move the oil to the well bore. Economically, without the use of waterflooding the field would reach its economic limit, be plugged and abandoned prematurely, still leaving in the ground up to 80% of the otherwise recoverable oil.

All of the properties involved herein would qualify for the stripper well exemption from price regulation if injection wells were counted in determining the average daily production .from the leases. None qualify if injection wells are not counted. No contention is made that injection wells on the properties here involved were not necessary on either sound geological bases or oil industry standards.

FEA Regional Offices are now conducting investigations of plaintiffs Energy Reserves Group, Inc., Suburban Propane Gas Corporation, and Sierra Petroleum Company, Inc. practices in connection with crude oil production from various properties. The agency has issued a Remedial Order, April 23, 1977, with respect to one of Suburban's properties following issuance on November 22, 1976, of Notice of Probable Violation (NOPV) to Suburban, three written replies by Suburban, and a conference. In the Remedial Order, FEA found Suburban had violated applicable regulations by treating production of the property as exempt from controls pursuant to the stripper well lease exemption and that such violations had resulted in overcharges of $451,807.74. Accordingly, the Remedial Order required Suburban to refund within 120 days from the effective date of the Order the described sum, plus interest, to its purchaser. Suburban's appeal from the Remedial Order, together with an application for stay, are pending.

On November 29, 1976, the FEA issued a NOPV to plaintiff Marathon, alleging it had erroneously classified its Grass Creek Unit as a stripper well lease by including injection wells in its well count. The NOPV states the inclusion of injection wells is erroneous under FEA Ruling 1974–29. The NOPV concludes that during the period from December 1, 1973 to May 31, 1975, Marathon made overcharges of $2,842,-715.00 in sales of approximately 495,992 barrels of crude oil produced from the Grass Creek property.

On December 17, 1976, the FEA issued a Remedial Order to Sklar and Phillips Oil Company finding, inter alia, that oil produced from various leases operated by Sklar did not qualify for stripper well treatment because of the inclusion of injection wells in the computation of eligibility. The Remedial Order provided Sklar must refund $303,-038.00, plus interest, to its purchaser. On February 4, 1977, Sklar filed an appeal from the Remedial Order. Hearing was held on April 18, 1977, and on August 2, 1977, the FEA issued an order denying Sklar's appeal as to the issues relevant herein.

WAS RULING 1974–29 INTERPRETATIVE OR SUBSTANTIVE, AND PROPERLY PROMULGATED UNDER THE ADMINISTRATIVE PROCEDURE ACT?

The Court will first consider whether FEA Ruling 1974–29 is interpretative or

substantive in nature. Such determination is necessary in order to ascertain whether Ruling 1974–29 was enacted with proper legal procedures and the extent of judicial review as to the merits of the ruling. Plaintiffs assert the ruling is substantive and therefore void because notice and opportunity for comment were not provided. Plaintiffs further contend if the ruling is found to be interpretative, then the Court has extensive powers to review and overrule the merits of the ruling. Defendant asserts the ruling is merely interpretative, but is nevertheless entitled to "great deference" as an agency's interpretation of its own regulation.

■ In enacting the EPAA, Congress conferred upon the President the power to promulgate substantive regulations providing for the mandatory allocation and pricing of, inter alia, crude oil. On December 4, 1973, the President, by Executive Order, established the the FEO and delegated to it all authority vested in the President by the EPAA. On June 27, 1974, the FEA Act of 1974 established the FEA. That same day, Executive Order No. 11790 abolished the FEO and transferred all powers and functions of the FEO to the FEA. Therefore, the FEA has legal authority to promulgate substantive rules or regulations pursuant to the EPAA as amended. See *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 410–411, 50 L.Ed.2d 343 (1976).

■ Although the FEA has authority to issue guidelines having the force and effect of law, this does not mean every regulation promulgated by the FEA is substantive. "That agency activity falls within the permissible scope of statutory authority does not alone answer the question of the applicability of Section 4" [of the Administrative Procedure Act]. *National Motor Freight Traffic Association v. United States*, 268 F.Supp. 90 (D.D.C.1967). The label attached to a ruling by the enacting agency, the procedures utilized to promulgate it, and the practical effect given such ruling in further agency proceedings relevant thereto, are all factors indicative of whether a rule is interpretative or substan-

tive. If the FEA intends a rule to be substantive, it is required to label it as such and utilize APA notice and comment procedures necessary to render the final guideline legally effective. See 15 U.S.C. § 757(i)(1). A substantive guideline promulgated without resort to such procedures is invalid.

In its briefs before the Court the FEA labels Ruling 1974–29 as merely interpretative of its own prior regulation, and claims it is therefore not required to be promulgated pursuant to notice and comment. Defendant's brief of May 23, 1977, states at page 14:

> Rulings are issued by the agency in its discretion whenever there have been a number of inquiries regarding a particular section of the regulations or when the General Counsel determines it will assist the public in applying the regulation to a specific situation. 10 C.F.R. § 205.151. Objections to a ruling may be filed with the General Counsel. 10 C.F.R. § 205.153.

In issuing Ruling 1974–29, defendant states FEA General Counsel placed sole reliance upon his interpretation of the phrase "wells which produced crude petroleum" in the regulation defining the statutory term "average daily production." There is no regulation defining the word "well" as used in the statute, although the effect of Ruling 1974–29 is to define the statutory term as excluding injection wells. It does not appear that FEA General Counsel, in analyzing the phrase "wells which produced crude petroleum," considered the effect of his ruling upon the statutory term "well," nor does he appear to have considered legislative intent or prior legislative treatment of stripper leases in other contexts, nor did he consider industry understanding of the term "well" as applied to stripper well leases.

The above method of promulgating Ruling 1974–29 was legally sufficient for its validity as an interpretative ruling if such was the actual effect given it by the FEA. However, a Court's decision as to whether a rule is actually substantive or interpretative must also be based upon the substantive

effect of the agency's action, and not merely on the label or designation chosen by the agency. *Nader v. Butterfield*, 373 F.Supp. 1175 (D.D.C.1974). The problem with the FEA's label and method of promulgating Ruling 1974–29 develops when the Court considers the actual effect given the ruling by the FEA in subsequent proceedings.

■ If an agency properly enacts a substantive rule, the rule has the following legal effect:

> [A substantive rule] establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in this particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency. *Pacific Gas & Electric Co. v. Federal Power Commission*, 164 U.S.App.D.C. 371, 376, 506 F.2d 33, 38 (1974).

An interpretative rule cannot be treated by the agency as having in itself the force of law. Rather, it has the effect described below for a general statement of policy:

> When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy. Id.

■ Courts, considering whether agency orders enacted without notice and opportunity for comment are actually utilized by the agency as substantive or interpretative, have looked to the language of the order itself, and to the language of any subsequent proceedings concerning the subject matter of the order. Where the order is phrased as a guide to the agency's present views, subject to change, and with no suggestion these views have the finality or force of substantive regulations, as in *National Association of Insurance Agents v. Board of Governors of Federal Reserve System*, 160 U.S.App.D.C. 144, 489 F.2d 1268 (1974); or where the order has no immediate inflexible impact and is specifically left open to discussion, as in *Pacific Gas & Electric Co. v. Federal Power Commission*, 164 U.S.App.D.C. 371, 376, 506 F.2d 33, 38 (1974), such agency orders are deemed to be interpretative. Ruling 1974–29, previously quoted, is clearly phrased in terms of a final agency opinion not open to further discussion or presentation of evidence by affected members of the regulated industry.

Further persuasive evidence of an agency order's interpretative status is present where the administrative agency, in subsequent rulings involving the subject matter of the order, does not cite the order as having legal force in itself but rather rules upon the merits of the subject matter directly citing the statute interpreted by the order. *Pesikoff v. Secretary of Labor*, 163 U.S.App.D.C. 197, 501 F.2d 757 (1974). The "Board decision on review should be firmly grounded upon substantial and extensive record evidence and the Board should not attempt to apply the policy statement . . . as a rule of law." *Pacific Gas & Electric Co. v. Federal Power Commission*, supra, 164 U.S.App.D.C. at 377, 506 F.2d at 39.

A Remedial Order issued to a party whom the FEA has found to be in noncompliance with FEA regulations is required to "include a written opinion setting forth the relevant facts and legal basis" for the order. 10 C.F.R. § 205.192(a). The Remedial Order issued to Suburban Propane by the FEA on April 25, 1977, states in part:

> II. (A) As a corollary to Argument II immediately above, SUBURBAN suggests that FEA Ruling 1974–29 was in fact a new rule or regulation which the FEA General Counsel could not rightfully promulgate. SUBURBAN claims that Ruling 1974–29 "established the first definition of a well for purposes of the stripper well exemption."
>
> While the arguments SUBURBAN makes are made with great energy, and SUBURBAN no doubt believes the same to be right and logical, these arguments must be rejected by FEA.

In Ruling 1974–29, FEA stated that under FEA regulations (and not due to any "interpretation" by the General Counsel) a stripper well property must be defined in terms of *"the number of wells which produce* crude petroleum and petroleum condensates." [Reference 10 C.F.R. Sec. 210.32(b).] Indeed, the emphasis above was supplied in the Ruling, not by this Remedial Order. It was pointed out that "wells which did not actually yield or produce crude petroleum during the preceding calendar year are not production wells" for the purpose of determining a stripper well property. (citation deleted.) This was a "ruling" not an "interpretation" and thus, merely stated what the pertinent regulations had always meant. SUBURBAN has misinterpreted the regulations and its arguments on the point must be rejected by FEA.

III. (B) SUBURBAN next indicates that Ruling 1974–29 is erroneous and is inconsistent with Congressional intent and FEA Ruling 1974–28.

Clearly, if FEA believed Ruling 1974–29 to be inconsistent with the law as passed by the Congress, the FEA would not have issued Ruling 1974–29. FEA rejects this argument by SUBURBAN basically for the reason that FEA was, by Ruling 1974–29 correctly stating the meaning of the regulations (see FEA Answer II(A) above).

To Suburban's assertions that Ruling 1974–29 contradicts applicable state and industry standards, the FEA replied at page 15 of the Order:

FEA has consistently taken the position that it will not allow any state authority to dictate to FEA what the regulations are or what they mean. Likewise this applies to regulations promulgated by other federal agencies. To accept state interpretation of federal law would be to make a mockery of the "Supremacy Clause" of the United States Constitution, and to allow other federal regulations to be used in the interpretation of FEA regulations would be to contravene Section 8 of the Emergency Petroleum Allocation Act under which the FEA is given the authority, subject to the laws of the Congress, to regulate oil prices. Thus, FEA regulations cannot be subject to contradiction by the regulations of other federal agencies.

SUBURBAN is surely aware that different laws and regulations are enacted for different purposes. To allow FEA regulations to be interpreted according to regulations which have nothing to do with the regulation of oil prices [FEA's function] would most certainly produce results which would be violative of Congressional intent and federal law.

In its Remedial Order against Sklar-Phillips Oil Company, issued December 17, 1976, the FEA states in part:

1. Texas law does not govern the application of a federal price control program. The fact that Texas considers an injection well with transferred allowables to be a producing well, if it does, has no bearing on how the term "producing well" is defined by federal regulatory law. Ruling 1974–28 (sic) clearly states that the FEA considers injection wells to be "nonproducing" wells,

"While injection techniques help to 'produce' crude petroleum, they are not wells which themselves 'produce' crude petroleum."

2. Again, Ruling 1974–28 (sic) clearly excludes injection wells from the term "producing well." A "producing well" is one "which produces crude petroleum." The word "yield" is used synonymously with the word "produce" in the Ruling and is so considered in English dictionary usage. Therefore, no distinction exists between the two words and nothing short of production was contemplated with the use of the word "yield."

3. FEA rulings are not legislation of new law, rule-makings, interpretations or exceptions. They are merely clarifications of what the law has always been. Like the regulations themselves, they are published as a guide to aid the industry in applying the law, specifically, in this case, the Emergency Petroleum Allocation Act.

Thus, by their very nature, they are internally consistent, not inconsistent as Sklar maintains, and in line with the policy objectives of Congress.

Finally, the Decision and Order of the FEA on the appeal of Sklar-Phillips from the above Remedial Order, issued August 2, 1977, quotes the purpose of the stripper well exemption as being "to ensure that direct or indirect price ceilings do not have the effect of resulting in the loss of any domestic crude oil production or the premature shutdown of stripper wells for economic reasons." 19 Cong.Rec.S. 13452 (daily ed. July 14, 1973). The FEA also cited Congress' intention that the exemption be strictly enforced so as to prevent altering of normal patterns of operations, such as "gerrymandering" to achieve a benefit not otherwise available. The Order then states at page 7:

In Ruling 1974–29, the FEA simply clarified the meaning of producing wells in light of the underlying Congressional intent. The Ruling did not involve any policy or regulatory changes by the FEA but served merely as a formal notification of the interpretation that the FEA has always placed on the regulations implementing the stripper well exemption. Therefore, since Ruling 1974–29 simply clarified the terms and intent of the underlying regulations, it was not the type of rule-making proceeding to which the formal requirements of the APA would apply. Moreover, since the interpretation of the method of computing the number of producing wells on a property rests securely on the objectives which the Congress expressed in the initial piece of legislation which referred to the stripper well property exemption, there is no basis for Sklar's allegation that the Ruling involves a retroactive modification of preexisting requirements. (citation omitted.)

All of the above-cited Orders of the FEA rely upon Ruling 1974–29 as legal authority for enforcement action. Although superficially touching upon very real questions of congressional intent, the FEA does not analyze such intent upon the basis of federal and state regulations treating injection wells as producing wells for related purposes at the time the statute was enacted, or upon the basis of industry understanding of the term "wells", or "wells which produce" as related to stripper well leases. "When Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Neither does the FEA consider the actual impact of allowing or refusing to allow injection wells to be counted for purposes of calculating stripper lease status as related to the congressional purpose of encouraging stripper lease operators to keep wells in operation for longer periods of time and encourage them to make new investments in eligible wells. See TAPAA Conference Report, supra. The FEA's statement, namely, "Clearly if the FEA believed Ruling 1974–29 to be inconsistent with the law as passed by Congress, the FEA would not have issued Ruling 1974–29," patently reflects the agency's attitude that Ruling 1974–29 is legal authority in itself, the factual and legal basis for which will not be reconsidered. Such is not a Board decision "firmly grounded upon substantial and extensive record evidence," but rather, it is clear the agency is attempting to apply the Ruling as a rule of law. *Pacific Gas & Electric Co. v. Federal Power Commission,* supra, 164 U.S.App.D.C. at 377, 506 F.2d at 39.

■ A final important consideration in determining whether a rule is interpretative or substantive in nature is the extent of its impact upon the regulated industry. If a rule or order, no matter how labeled by the agency, has an immediate and significant impact upon a regulated industry or an important class of members of products of that industry prior to a chance for a full hearing upon the merits of the policy espoused in the rule, then notice and an opportunity for comment are required. *Pacific Gas & Electric Co. v. Federal Power Commission,* supra; *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2nd Cir. 1972);

*Texaco v. Federal Power Commission,* 412 F.2d 740 (3rd Cir. 1969); *Pharmaceutical Manufacturers Assoc. v. Finch,* 307 F.Supp. 858, 863 (D.Del.1970); *National Motor Freight Traffic Association v. United States,* 268 F.Supp. 90 (D.D.C.1967).

Legislative intent that APA provisions, or at least some minimal form of notice and opportunity to comment is required before the FEA promulgates rulings having substantial impact upon the regulated industry, is clearly set out in House and Senate reports emerging from the Energy Act Conference Committee, as follows:

> The subsection [7(i)(1) and (3)] applies, with modifications, Administrative Procedure Act provisions not only to rules and regulations, but also to orders similar to a rule or regulation. This reflects the conferees' intent that the Administrator should provide notice and opportunity for comment whenever his proposed action could have an impact on more than the few persons who, in the absence of such public notice, would be likely anyway to receive personal notice of the proper action. It is expected that the exception to the notice provision in paragraph (B) of section 7(i) of the conference substitute will be used sparingly. . . . The conferees intend that if the Administrator is in doubt about the applicability of any of the standards provided in this section, he will resolve the doubt in favor of the fullest application of procedural safeguards. 120 Cong.Rec.H. 3088 (April 23, 1974).

Plaintiffs assert and defendant does not dispute the properties involved herein would not be producing crude oil were it not for the use of injection wells because of economic and physical realities of oil production. Plaintiffs also assert injection wells cost as much to maintain as do other producing wells. The purpose of exempting small stripper wells from the price restraints of the Energy Acts is to insure that direct or indirect price ceilings do not result in loss of domestic crude oil production from the premature shutdown of stripper wells for economic reasons. 2 U.S.Cong. & Admin.News, pp. 2531–32 (1973). If the costs for maintaining an injection well are similar to those for maintenance of a producing well, and the producing well would not produce were it not for the injection well, then the economic limit of a lease involving injection wells is substantially affected by whether or not injection wells can be calculated for determination of stripper status.

A further substantial effect upon producers such as plaintiffs herein results from FEA regulations requiring operators to certify to the purchaser of oil that the property from which the oil is produced qualifies for the stripper exemption. 10 C.F.R. 212.-131(a)(1). The erroneous certification of a property as a stripper well property constitutes a violation, 10 C.F.R. 205.202, and is punishable by a civil penalty, 10 C.F.R. 205.-203(b), or even imprisonment and fine, 10 C.F.R. 205.203(c). Producers who until Ruling 1974–29, certified their properties as "stripper," based upon consistent prior governmental and industry understanding of injection wells as "producing" for stripper lease or allowable purposes, suddenly found themselves liable for reimbursement of large sums to purchasers and possible civil fines. Such potential enforcement sanction has a substantial effect upon the economic planning of the producer, as well as upon decisions as to whether or not to maintain production from these same leases. Without being afforded a hearing upon the merits of Ruling 1974–29, plaintiffs clearly face a dilemma of double risk portent, whether to certify leases they believe they are statutorily entitled to certify as "stripper" and thereby risk FEA prosecution, or whether to forbear certification and permanently lose the opportunity to receive the higher price for their oil if it is economically feasible for production to continue. See *Phillips Petroleum Co. v. FEA,* 435 F.Supp. 1239 (D.D.C.1977).

Upon the basis of the substantive effect given Ruling 1974–29 in subsequent proceedings before the FEA, and the substantial effect it has upon plaintiffs prior to any chance for presentation of evidence or hearing upon the merits of the ruling, the Court

finds Ruling 1974-29 to be a substantive rather than an interpretative order. Because Ruling 1974-29 was promulgated by the FEA without notice or opportunity for comment, it is void and ineffective to affect the rights of plaintiffs herein. See *Morton v. Ruiz*, 415 U.S. 199, 39 L.Ed.2d 270, 94 S.Ct. 1055 (1974).

Plaintiffs have raised significant questions in these proceedings as to whether Ruling 1974-29, even if it were legally promulgated, is consistent with the purposes of the stripper lease exemption of the Energy Act. See 15 U.S.C. § 757(h), (i). It appears to the Court that by promulgation of Ruling 1974-29, the FEA has effectively defined the statutory term "well," as 15 U.S.C. § 757(h), (i) empowers the President, and therefore the FEA, to do so. In doing this without hearings as to the actual effect of such definition upon the congressional purpose of encouraging continued production from marginal leases, and without consideration of any legal or industry precedent indicating whether or not such definition was within congressional intent as to wells to be counted in determining stripper lease status, the FEA has shirked its duty to fully inform itself of important implications prior to enacting such substantial regulation.

It is usual and sound judicial policy to proceed no further in a case as to the issues of fact and law raised by the parties than is necessary for decision. In other words, where decision is apparent and effective on one issue, often equally important justiciable issues are not reached. The Court chooses to follow such a judicial precept here. However, the Court feels he would be remiss if at least some comment is not directed to some legal points raised by both the able government and oil industry counsel.

Overall, the Court has been impressed with the thoroughness, accuracy and logic of the plaintiffs' consolidated brief, and in particular with the supplemental brief of plaintiff Marathon Oil. The FEA position, while correct in stating many broad governmental postulates of statutory interpretation and the "sanctity" of administrative expertise, seems to indicate less than the wide grasp one would expect such an agency to have of the basics of the oil and gas industry and relation thereof to past governmental practice in legislative, administrative and judicial concepts. While in this decision the Court has reluctantly refrained from upholding plaintiffs' persuasively briefed position that the FEA exceeded its statutory authority under the basic congressional enactments of TAPAA and EPAA in reaching the administrative position reflected by Ruling 1974-29, it does seem abundantly clear to the Court that the following phrasing or paraphrasing of the plaintiffs' argument has either been misconstrued or minimized by defendants as representatives of the sovereignty of government:

The most salient facts in the background of the case are: (1) that at the time of enactment of the TAPAA and the EPAA in 1973, a cabinet agency of the federal government, the United States Department of the Interior, had for four decades consistently and unequivocally ruled that injection wells should be counted; (2) that this view was also held by some state regulatory agencies, in major oil producing states, and the petroleum industry generally; (3) that when the Congress chose in 1973 to provide an exemption from price and allocation controls for stripper wells, Congress chose to define that exemption by *the very phrase* (i. e., "average daily production" per well) *coined and used by the Interior Department's regulations* pursuant to which injection wells had been treated as producing wells for forty years; and (4) that the legislative history of the stripper exemptions shows that its sponsor assumed that injection wells would be counted in determining the average daily production per well of producing properties. Moreover, it is also beyond dispute that the Interior Department's reasons for permitting the counting of injection wells and the Congress' purpose in exempting stripper well production from price controls are the same—to encourage the continuation and

enhancement of crude oil production from marginal properties where production efforts are much more costly. The Cost of Living Council's (CLC) regulations implementing the EPAA also clearly referred to the Interior Department's phrase embodying that Department's longstanding position. Although the CLC originally promulgated the regulations implementing the stripper well lease exemption of both the TAPAA and the EPAA, the Federal Energy Office and the FEA both adopted the CLC regulations without substantial change and, like the CLC, without first giving notice of proposed rulemaking of their intent to adopt those regulations.

It is additionally persuasive that our Tenth Circuit in *Marathon Oil Co. v. Kleppe*, 556 F.2d 982 (decided June 7, 1977), judicially affirms the historic purpose and use of the Department of Interior regulations on injection wells:

> The use of water injection wells is a conservation measure designed to get maximum production from the oil producing wells in a given participating area. Both parties agree that water injection wells are permitted to be counted as oil producing wells, in determining the average daily production per well, in order to encourage lessee to drill as many injection wells as will efficiently contribute to increased production.

One of the difficulties of FEA officials seems to be a failure to grasp the overwhelming use of waterflooding techniques in stripper well production. Again, one of the weaknesses of the government's overall position is best illustrated by reproducing Footnote 10 of Marathon's Supplemental Brief at pp. 18-19:

> The government has previously argued that the stripper exemption should be construed narrowly and, in support of this contention, has cited language from the Conference Report accompanying the TAPAA which stated that Congress intended to prevent the "gerrymandering" of leases. It is clear, however, that Congress was not there concerned with a

narrow construction of the statutory term "well." Rather, it was concerned with a narrow construction of the statutory term "lease." In order to prohibit the gerrymandering of leases to average down high and low production leases, the CLC narrowly defined the word "property" in its regulations implementing the TAPAA and EPAA and stated as its reason for doing so the following:

> For purposes of this exemption, the term "property" is described as being co-extensive with that "property" used to determine 1972 base production control levels, as measured by leases in existence in 1972. *This narrow definition was adopted in order to comply with the Congressional intent expressed in the Conference Report which stated that the Congress specifically intends that the regulations shall, among other things, prevent any "gerrymandering" of leases* to average down high production wells with a number of low production stripper wells to remove the high production wells from price ceilings. (H.R.Rep.No. 93–624.) 38 Fed. Reg. at 32495. (Emphasis added.)

Thus, it is clear that the definition of "average daily production" which Ruling 1974–29 purports to interpret is totally unrelated to the prevention of the so-called gerrymandering of leases. There is simply no evidence that Congress intended the definition of "well" in the TAPAA and EPAA stripper well exemptions to be narrowly construed. The legislative history, moreover, indicates precisely the opposite.

Finally, the anomaly of governmental action is shown by FEA's position on one unit of the leases involved in this litigation. We quote from pp. 19–20 of Marathon's Supplemental Brief:

> Marathon has intervened in this litigation because Marathon received a Notice of Probable Violation (NOPV) from the FEA which alleged that it had illegally counted injection wells in determining the average daily production per well from its Grass Creek Frontier Unit in

Wyoming (the Grass Creek Unit). The FEA has alleged that crude oil has been sold at prices $2.8 million in excess of the prices which could have been charged had production from the Grass Creek Unit not been sold as stripper crude. At the time Marathon determined that average daily production per well from the Grass Creek Unit should be determined by counting injection wells, it was operating that unit under regulations promulgated by the Department of Interior. As operator of the unit, Marathon was required to pay royalties to the Department of Interior based on the average daily production from the unit. Under the governing DOI regulations contained in 30 C.F.R. § 221.-49, an injection well is treated as a "producing well" and "average daily production" per well is, therefore, computed by counting injection wells. Accordingly, Marathon has computed the average daily production per well for the Grass Creek Unit to be less than 10 barrels per day for purposes of paying royalty to the DOI since 1972.

■ Accordingly, this Court is in accord with this "nutshell" quote from p. 21 of the Marathon Supplemental Brief:

This Court has the power to determine for itself what is the meaning of the phrase "average daily production" in the statutes and in the regulations in light of all the relevant circumstances. We think it quite extraordinary that two federal agencies—the Interior Department and the FEA—should have regulations on the identical subject with the identical purpose (encouraging crude oil production from stripper leases) with such radically different consequences for a single property such as Marathon's Grass Creek Unit. We submit that both agencies cannot be simultaneously correct as to which interpretation is more effective in encouraging crude oil production. Even more important, it is unthinkable that, when Congress authorized the exemption of stripper crude from its newly imposed program of price controls, it intended the agencies administering those controls to turn their backs on the forty years of

experience accumulated by the Interior Department on the very problem.

Nevertheless, recognizing the importance of the application of the doctrine of administrative expertise repeatedly laid down by the Supreme Court to prevent undue interference by courts with regulatory functions of national interest, we do adequate justice here by simply invalidating Ruling 1974–29 for the reasons stated herein.

The expertise of the FEA should be brought to bear upon these issues after the agency has given interested parties the opportunity to present evidence upon which it can then rationally base its conclusions. For this reason the Court, at this time, will not rule upon the issue of whether Ruling 1974–29, even if it were legally enacted, would be arbitrary, unreasonable, or in conflict with its statutory authority.

## OTHER HOLDINGS

■ Plaintiffs have alleged that regulations underlying Ruling 1974–29 found at 10 C.F.R. § 212.54 are invalid for failure of the CLC, FEO and FEA to observe procedural requirements of the APA in promulgating and adopting such. The Court finds, in view of the legislative requirement of expeditious promulgation by the CLC implementing TAPAA and EPAA, and of the necessity to quickly decontrol stripper lease prices once Congress' intent to do so was statutorily mandated in order that oil not be held off the market in anticipation of such price increase (see *Nader v. Sawhill,* 514 F.2d 1064 [Em.App.1975]), that "good cause" existed for the CLC's failure to follow APA notice and comment procedures. Rules promulgated by the FEO on December 27, 1973, expressly noted the "emergency nature of the Mandatory Petroleum Products Allocation Program" in asserting "good cause" for failure to follow otherwise required procedures. 39 Fed.Reg. 746, January 2, 1974. These regulations, adopted and revised by the FEO, were later adopted by the FEA. The original promulgation being lawful, such subsequent changes in the agency enforcing such regulations does

not render them invalid under the APA. See *Nader v. Sawhill,* supra. It should be emphasized that the Court's holding applies only to procedural legality of the above regulations and in no sense constitutes accord upon the legality of the regulations' substance as presently interpreted and contended by FEA.

Having found Ruling 1974–29 void and ineffective to affect the rights of plaintiffs herein, the Court need not address plaintiffs' third principal contention as to retroactive application of such Ruling. Nor is it necessary to address the government's contention that subsequent legislative enactments impliedly ratified Ruling 1974–29 by failure to address or revoke such administrative fiat. This reasoning is not persuasive in the absence of any showing Congress was made aware of such agency interpretation and actually considered it or an existing problem relating to its application in subsequent deliberations. See *United States v. Calamaro,* 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957); *Rothenberg v. United States,* 233 F.Supp. 864 (J. Brown, D.Kan.1964), aff'd 350 F.2d 319 (10th Cir. 1965); *Kay v. Federal Communications Commission,* 143 U.S.App.D.C. 223, 443 F.2d 638 (1970). Congress is not deemed by the Courts to be omniscient as to each of the multitude of agency statutory interpretations tangentially affecting matters under its consideration.

IT IS THEREFORE ORDERED that Ruling 1974–29 is void and of no legal effect and that the FEA, or its successor the Department of Energy, is hereby enjoined from administrative use, application, implementation or enforcement of such Ruling against plaintiffs herein.

IT IS FURTHER ORDERED that regulations found at 10 C.F.R. § 212.54 are legally valid as promulgated in accordance with applicable APA procedural requirements.

IT IS FURTHER ORDERED that the costs of this action are assessed against the defendants herein.