**GRACE PETROLEUM CORPORATION, Plaintiff,**

v.

**DEPARTMENT OF ENERGY, James R. Schlesinger, Secretary of Energy, David J. Bardin, Administrator, Economic Regulatory Administration, Sun Oil Company of Pennsylvania, and Kerr-McGee Refining Corporation, Defendants.**

No. CIV–78–0672–E.

United States District Court, W. D. Oklahoma.

Aug. 31, 1978.

Philip D. Hart, Terry R. Barrett, C. David Stinson of McAfee, Taft, Mark, Bond, Rucks & Woodruff, Oklahoma City, Okl., for plaintiff.

Larry D. Patton, U. S. Atty., and Ronny D. Pyle, Asst. U. S. Atty., Oklahoma City, Okl., for defendants Dept. of Energy, James R. Schlesinger and David J. Bardin.

Mary Lynn Sebek, Dept. of Justice, Civ. Div., Economic Litigation Section, Washington, D. C., for defendant Secretary of Energy.

C. Steven LeBaron, Philadelphia, Pa., for defendant Sun Oil Co. of Pa.

Richard Guy Harris and Richard F. Campbell, III, Kerr-McGee Corp., Oklahoma City, Okl., for defendant Kerr-McGee Refining Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EUBANKS, District Judge.

### INTRODUCTION

On June 29, 1978, plaintiff filed a complaint in which it challenged the validity of Ruling 1974–29 and sought a declaration that the Ruling or its underlying regulation, 10 C.F.R. § 212.54, is null and void, and preliminary and permanent injunctive relief against the enforcement of the stripper well regulation as interpreted by the Ruling. On June 30, 1978, while the undersigned was on vacation, the Honorable Ralph G. Thompson, United States District Judge for the Western District of Oklahoma, acting for and on behalf of this writer, upon plaintiff's motion and following an appearance by plaintiff's counsel, issued a Temporary Restraining Order restraining and enjoining defendants James R. Schlesinger, Secretary of the Department of Energy (DOE), and David J. Bardin, Administrator of the Economic Regulatory Administration, and their respective officers, agents, servants, employees and attorneys from taking any action preliminary to enforcing against plaintiff the provisions of 10 C.F.R. § 212.54 as applied by the Ruling. That Order has been renewed several times by this Court, most recently until such time as a decision is reached with respect to the issuance of a preliminary injunction.

On July 17, 1978, this Court heard argument of counsel on plaintiff's motion for a preliminary injunction and thereafter requested counsel to submit to the Court proposed findings of fact and conclusions of law.

The Court wishes to make it clear that the findings of fact and conclusions of law hereinafter delineated are based on the limited evidence presented at the aforesaid hearing and the Court reserves the right to change same in any manner after hearing further evidence and after fuller legal research.

The Court overrules the challenge to the venue of this Court made by the federal

defendants and further states that at this time the Court is of the opinion that the decision of the Honorable Frank G. Theis of the District of Kansas in *Energy Reserves Group et al. v. FEA*, 447 F.Supp. 1135 (D.Kan.1978), is not controlling here because his ruling concerned the method and manner of adopting the regulation being challenged and not the propriety of same. Therefore, although this court originally believed that a decision by the Temporary Emergency Court of Appeals in connection with the *Energy Reserves* case would be helpful here, and was inclined to delay this decision until same was handed down, I have now concluded that a delay would be of no avail. And for the further reason that this case should be expedited, I have decided to make findings and conclusions herein without further delay.

## FINDINGS OF FACT

1. James R. Schlesinger is the Secretary of the Department of Energy (DOE), an agency of the United States, organized and existing under the provisions of the DOE Authorization Act (42 U.S.C. § 7101, *et seq.*), which administers the provisions of the Emergency Petroleum Allocation Act (EPAA) (15 U.S.C. § 751, *et seq.*), relating to the mandatory allocation and pricing of crude oil. DOE is the successor agency to the Federal Energy Administration (FEA).

2. Section 4(e)(2)(A) of the EPAA carves out an exception from price controls for the first sale of crude oil produced on stripper well leases:

The regulation promulgated under subsection (a) of this section [requiring the President to promulgate regulations for allocation and pricing of crude oil and certain other hydrocarbons] shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well.

3. Regulations promulgated by the Cost of Living Council defined the term "stripper well lease" as follows:

A "property" whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed 10 barrels per day during the preceding calendar year. 6 C.F.R. § 150.54(s); 10 C.F.R. § 210.32(b).

and defined the term "average daily production as being:

[T]he qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of calendar days in that year times the number of *wells which produced crude petroleum* and petroleum condensates, including natural gas liquids, from that property in that year. 6 C.F.R. § 150.54(s); 10 C.F.R. § 210.32(b). (emphasis added)

4. On December 19, 1974, the FEA issued Ruling 1974–29, which clarifies 10 C.F.R. § 212.54, the stripper well exemption regulation. The Ruling states that only wells from which crude oil is produced may be counted when determining whether a property is entitled to the stripper well exemption; dry wells, water or steam injection wells or any other nonproducing wells must be excluded.

5. On January 25, 1978, the Honorable Frank G. Theis of the United States District Court for the District of Kansas issued a decision in *Energy Reserves, supra,* 3 CCH *Energy Management* ¶ 26,093, declaring the Ruling null and void. DOE appealed that decision to the Temporary Emergency Court of Appeals (TECA), which heard arguments on May 8, 1978. Pending a determination by TECA, Judge Theis stayed his decision and issued a preliminary injunction restraining DOE from enforcing 10 C.F.R. § 212.54, as interpreted by Ruling 1974–29, against the *Energy Reserves* plaintiffs. TECA is expected to rule within a matter of months.

6. On June 29, 1978, Grace Petroleum Corporation (Grace) (then Cleary Petroleum Corporation), a Delaware corporation, filed a complaint seeking a declaration that Rul-

ing 1974–29 or the stripper well regulation which it interprets, 10 C.F.R. § 212.54, is null and void, and preliminary and permanent injunctive relief against enforcement of 10 C.F.R. § 212.54 as interpreted by the Ruling.

7. Grace, in addition to other business activities, engages in the production of crude oil on leases known as the March Lower-Skinner Sand Unit (March Unit) and the J. T. Richardson Lease (Richardson Lease) by means of a secondary recovery procedure commonly known as waterflooding. In waterflooding operations injection wells are used to force water into the producing formation and force crude oil out of the producing wells. The March Unit and Richardson Lease consist of 2 active producing wells and 8 active injection wells, and 5 active producing wells and one active injection well, respectfully.

8. If Grace is permitted to count both active producing wells and active injection wells on the March Unit and the Richardson Lease, the amount of crude oil produced on each property will average 10 barrels or less per day per well. Accordingly, each property will qualify for the stripper well exemption. If Grace is permitted to count only active producing wells in its calculations, the amount of crude oil presently produced on each property will average more than 10 barrels per day per well and neither property will qualify for the stripper well exemption.

9. Pursuant to EPAA guidelines crude oil is classified as lower tier, selling at approximately $5.54 per barrel; upper tier, selling at approximately $12.60 per barrel; and stripper well exempt, selling at approximately $15.04 per barrel. If the March Unit and Richardson Lease qualify as stripper well exempt properties, crude oil produced on those properties will sell for $15.04 per barrel. If the properties do not qualify for the stripper well exemption, crude oil produced thereon must be sold at the appropriate upper or lower tier prices.

10. On February 17, 1978, Grace certified to purchaser Sun Production Company that crude oil produced on the March Unit

was exempt from EPAA price ceilings. On March 28, 1978, Grace certified to purchaser Kerr-McGee Refining Corporation that crude oil produced on the Richardson Lease was exempt from EPAA price ceilings. In each case, Grace included active injection wells in its calculations for the stripper well exemption.

11. If Grace is not permitted to certify the March Unit and the Richardson Lease based upon calculations including active injection wells, Grace will lose approximately $180,000 in revenues by the end of this year. Notwithstanding such projected losses, Grace would not discontinue production on the March Unit or Richardson Lease, would suffer no damage to its reputation, and would not be unable to meet its financial obligations as they become due if it is unable to certify its properties.

12. In May, 1975 Grace was the subject of an FEA investigation relating to alleged overcharges on sales of crude oil. In connection with that investigation, Grace entered into a consent decree pursuant to which Grace was required to refund certain monies to purchasers of its crude oil. Although Grace engaged in extensive negotiations with FEA, Grace did not appeal the FEA findings nor did it contest the authority pursuant to which the FEA instituted the investigation.

13. Civil or criminal sanctions imposed by DOE are appealable orders and subject to review.

14. In the three and one-half years that the Ruling has been in effect, Grace has never sought administrative exception relief to permit it to count injection wells in its certification calculations, nor did it intervene in the *Energy Reserves* case or institute any legal action prior to the five months following the decision in *Energy Reserves*.

15. Grace is not now nor has it ever been the subject of a DOE investigation with regard to the current certification of the March Unit or the Richardson Lease, nor has it received notice of a probable violation in this matter.

16. The current EPAA oil price guidelines were established both to encourage increased domestic oil production and to protect the consumer against uncontrolled oil price inflation.

17. If Grace is permitted to certify its properties as exempt, it will be eligible to charge a significantly higher price to purchasers of its crude oil. These purchasers will pass through their increased costs to the entitlements program, and ultimately, to the consumer.

18. There are at least 13 other similar suits for preliminary injunction pending in district courts throughout the United States. Granting relief in each of these cases would permit numerous oil producers to sell substantial quantities of crude oil at a price substantially in excess of that permitted under EPAA guidelines. The result would be substantial nationwide oil price increases borne by the consumer.

19. Pursuant to Section 211 of the Economic Stabilization Act of 1970, as incorporated into the EPAA, only TECA or the United States Supreme Court can declare a ruling issued under the EPAA invalid.

20. Congress intended the stripper well exemption to confer a benefit on oil producers producing 10 barrels or less per day per oil producing well. Congress did not intend the stripper well exemption to confer a benefit on all oil producers using waterflooding or any other method of secondary oil recovery.

21. The legislative history of the stripper well exemption demonstrates that the provisions of the stripper well regulation are entirely consistent with the Congressional intent.

22. The phrase "wells which produce crude petroleum" does not include wells which do not produce crude petroleum. Injection wells are not wells which produce crude petroleum.

23. Mr. Bob May, Director of Special Programs for Grace, is familiar with the language of the stripper well regulation, including the phrase "wells which produced crude petroleum."

24. In the ordinary course of his business, Mr. May has access to and knowledge of the amount of crude oil produced on the March Unit and Richardson Lease, and the number of active producing wells and active injection wells on each property.

25. In the ordinary course of his business, Mr. May refers to wells which produce crude petroleum as "producing wells" and wells into which water is injected as "injection wells."

26. It is common usage in the industry to refer to wells which produce crude petroleum as "producing wells," and wells into which water is injected as "injection wells."

27. In waterflooding operations, old producing wells may be converted into injection wells.

28. Waterflooding operations generally are conducted with one producing well for every 4 or more injection wells.

29. The APA requires notice and comment procedures in connection with substantive agency rulemaking, but specifically exempts from such procedures all interpretive agency rules.

30. The provisions of the APA may be modified or superceded only by express statutory authority.

31. The provisions of the APA are applicable to rulemaking under the EPAA because there is no express congressional intent to the contrary.

32. Ruling 1974–29 interprets the phrase "wells which produce crude petroleum" to exclude injection wells.

33. In over three and one-half years Congress has not acted to negate the meaning or the effect of Ruling 1974–29 or its underlying regulation.

## CONCLUSIONS OF LAW

1. Grace has failed to state a claim against federal defendants upon which relief can be granted.

2. Grace is not entitled to a preliminary injunction because it has not demonstrated that it is in immediate danger of suffering irreparable injury.

3. The fact that Grace will lose revenues if it is not permitted to certify the March Unit and Richardson Lease as stripper well exempt prior to a hearing on the merits of this case does not constitute irreparable injury. If Grace prevails following a hearing on the merits, it can be fully compensated by money damages awarded in the ordinary course of litigation.

4. The fact that Grace at some time may become the subject of a DOE investigation with respect to its certification of the March Unit and the Richardson Lease does not constitute an immediate threat of irreparable injury because Grace will have an opportunity to defend and to appeal any adverse decision.

5. Whether Grace will become the subject of a DOE investigation with respect to its certification of the March Unit or the Richardson Lease is purely speculative and does not constitute a threat of immediate injury.

6. The fact that Grace will continue to do business as usual if it is not permitted to certify its properties clearly indicates the absence of immediate and irreparable injury.

7. The fact that Grace has delayed three and one-half years before seeking relief of any kind in connection with the application of Ruling 1974–29 or its underlying regulation negates a finding of immediate and irreparable injury.

8. The fact that Grace previously has been the subject of an FEA investigation relating to overcharges in sales of crude oil and has entered into a consent decree with the FEA is irrelevant to whether Grace is threatened with immediate and irreparable injury.

9. Grace has introduced no evidence to demonstrate that the issuance of a preliminary injunction will not be detrimental to the public interest.

10. The issuance of a preliminary injunction in this and any of the other 13 similar cases currently pending throughout the United States could cause immediate oil price inflation, and thus frustrate the EPAA regulatory scheme evidenced by stated oil price ceilings. As above stated, however, the Court believes that, at least with respect to the *Energy Reserves* case, no precedent for the instant case is established.

11. The issuance of a preliminary injunction here or in any of the other similar pending cases would frustrate the Congressional intent of Section 211 of the Economic Stabilization Act of 1970, as incorporated into the EPAA, which requires that rulings issued under the EPAA be set aside only by TECA or the United States Supreme Court.

12. If a preliminary injunction here or in any of the other similar pending cases is granted and subsequently the *Energy Reserves* case is reversed by TECA, there will be no way to return oil price overcharges resulting from wrongful certification to the consuming public, and the public interest will be damaged.

13. Grace has no substantial likelihood of success on the merits of this case.

14. Ruling 1974–29 is an interpretive ruling wholly consistent with the meaning of the underlying regulation. Accordingly its publication did not require prior APA notice and comment procedures and the FEA did not exceed its authority in issuing the Ruling without reference to APA rulemaking requirements.

15. Ruling 1974–29 is an interpretive ruling wholly consistent with the common understanding of the members of the oil industry.

16. Because Congress has not acted to negate Ruling 1974–29 or its underlying regulation, it must be presumed that Congress has ratified or at least acquiesced in the meaning and effect of the Ruling and regulation. Accordingly, it follows that neither the Ruling nor the regulation is in conflict with the congressional intent in providing the stripper well exemption or the provisions of the EPAA.

17. Because the provisions of the stripper well regulation are entirely consistent with the Congressional intent, the FEA did not exceed its authority in promulgating

the regulation, and the regulation is not arbitrary, capricious or unreasonable.

18. Grace is not entitled to a preliminary injunction because it has failed to sustain its burden of demonstrating that without a preliminary injunction it will sustain immediate and irreparable injury; that the public interest will not be damaged if a preliminary injunction issues; and that it has a substantial likelihood of success on the merits.

19. For the foregoing reasons the temporary restraining order issued herein on June 30, 1978, is hereby vacated, set aside and held for naught.

The Court will, at its very earliest convenience, fix a date for hearing this matter in connection with plaintiff's application for permanent injunction.