**In re the DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.**

**ENERGY RESERVES GROUP, INC., et al., Plaintiffs-Appellees,**

v.

**DEPARTMENT OF ENERGY, et al., Defendants-Appellants.**

No. 10–39.

Temporary Emergency Court of Appeals.

Argued April 9, 1982.

Decided July 29, 1982.

Rehearing and Rehearing En Banc Denied Sept. 10, 1982.

Certiorari Denied Jan. 10, 1983.
See 103 S.Ct. 763.

Nancy C. Crisman, Dept. of Energy, with whom John P. McKenna, Frank W. Krogh, Marcia K. Sowles, Samuel Soopper and John L. Gurney of the same agency; and Paul M. Geier and Stephen W. Godoff, Dept. of Energy, Washington, D. C., of counsel, were on the brief for the defendants-appellants.

Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Chartered, with whom Dennis M. Feeney and John P. Bowman, Wichita, Kan., of the same firm; David J. Beck, Fulbright & Jaworski, with whom Ronald D. Secrest, Houston, Tex., of the same firm; Edward De LaGarza, Exxon Corp., Houston, Tex.; Daniel Joseph and Warren E. Connelly, Akin, Gump, Strauss, Hauer & Feld, Michael J. Henke and Ann M. Ashton, Vinson & Elkins, Washington, D. C.; Robert F. Ochs and Edward T. Cotham, Jr., The Gulf Companies Law Dept., Houston, Tex.; Richard L. Bohanon, Andrews, Davis, Legg, Bixler, Milsten & Murrah, Oklahoma City, Okl.; Herbert H. Hopper, Hopper, Shawver & Rathbun, Wichita, Kan.; Gerald Sawatsky, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan.; John C. Cirone and Kerry R. Brittain, Champlin Petroleum Company; Fort Worth, Tex., John E. Sparks and G. Stewart Stone, Jr., Brobeck, Phleger & Harrison, San Francisco, Cal.; Keith A. Jones, Fulbright & Jaworski, Washington, D. C.; H. V. Schaefer, Marathon Oil Company, Findlay, Ohio; D. Frank Frisina, The Standard Oil Company, Ohio, Cleveland, Ohio; John M. Shuey, Shuey, Smith & Fleming, Shreveport, La.; Arthur M. Meyer, Jr., Bracewell & Patterson, Washington, D. C.; Richard Jones and Evan J. Olson, Hershberger, Patterson, Jones & Roth, Wichita, Kan.; A. B. Conant, Jr. and Karen S. Bedell, Shank, Irwin, Conant, Williamson & Grevel, Dallas, Tex.; Mark J. Forsch, Mobil Oil Corporation, Dallas, Tex.; Tom P. Hamill, Mobil Producing Texas & New Mexico, Inc., Houston, Tex.; J. Frederick Lawson, Texaco, Inc., Tulsa, Okl.; Elaine Boze, Sun Oil Company, Dallas, Tex.; Philip E. Pankoff, Wood, Ris & Hames, Denver, Colo.; James B. Harris, Thompson & Knight, John McReynolds, Worsham, Forsythe & Sampels, Dallas, Tex.; Irley A. Bonnette, Anadarko Production Company, Houston, Tex.; George G. Olsen, Williams & Jensen, P. C., Washington, D. C.; Ronald A. Lane, Gus Svolos and Richard E. Weicher, Santa Fe Energy Company, Chicago, Ill.; James D. Voorhees, Davis, Graham & Stubbs, Denver, Colo.; Clark R. Mandigo, Energy Reserves Group, Inc., Wichita, Kan.; R. Kennedy Bridwell, Suburban Propane Gas Corporation, Morristown, N. J.; and Fred A. Gipson, Seminole, Okl., were on the brief for the plaintiffs-appellees.

Before GRANT, LARSON and LACEY, Judges.

GRANT, Judge:

These multidistrict litigation cases, consolidated for disposition by the Judicial Panel on Multidistrict Litigation at the United States District Court for the District of Kansas, present the issue of the validity of Federal Energy Administration (now the Department of Energy (DOE)) Ruling 1974–29 which interprets the stripper well exemption as excluding injection wells from well count, for purposes of applying the exemption from allocation and price regulation which is accorded crude petroleum produced from stripper well leases.[1]

### Background

The origin of these cases is with the decision of the United States District Court for the District of Kansas in *Energy Reserves Group, Inc. v. Federal Energy Administration,* 447 F.Supp. 1135 (D.Kan. 1978). In that case, Judge Theis invalidated Ruling 1974–29 on the basis that it was promulgated without satisfying the rulemaking requirements of the Administrative Procedure Act (APA). Importantly, Judge Theis did not, in his ruling, reach other challenges to the validity of Ruling 1974–29 but instead rested his decision solely upon nonconformity with the APA. On appeal, this court reversed that decision, in a plurality opinion, holding that the Ruling was "Clearly Interpretative and Exempted From the Requirements" of the APA. *Energy Reserves Group, Inc. v. Department of Energy,* 589 F.2d 1082, 1091 (Em.App.1978) (*Energy Reserves I*).[2] In that appeal, the appellees argued that Ruling 1974–29 was legislative in nature and effect and thus subject to the notice and comment requirements of the APA. 5 U.S.C. § '553(b) and (c). That argument was rejected, with Judge Becker writing:

> Assuming for purposes of discussion only that the "substantial impact" test determines whether an administrative rule is "interpretative" or "legislative," Ruling 1974–29 had no substantial impact on appellees.
>
> If Ruling 1974–29 was a reasonable interpretation of the stripper well statutory exception of EPAA and TAPAA, or of 10 C.F.R. § 210.32, or both, it had no impact. In that event the impact came from the statute and valid legislative regulation being interpreted, not from the interpretative ruling.

---

**1.** The ruling in question, Ruling 1974–29 (39 Fed.Reg. 44414, December 24, 1974), provides in its relevant part as follows:

> *Issue.* Is an "injection" well a "well" for the purpose of determining whether the average daily production of a property was 10 barrels or less per well in the preceding calendar year, for purposes of the stripper well lease exemption of 10 CFR 210.32?
>
> *Ruling.* No. Under the FEA regulations, the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from any stripper well lease, is exempt from the mandatory price and allocation regulations. A stripper well lease is defined as a property whose average daily production did not exceed 10 barrels per day per well during the preceding calendar year. "Average daily production" is further defined in 10 CFR 210.32(b) as:
>
> The qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of days in that year times the number of wells which produce crude petroleum and petroleum condensates, including natural gas liquids, from that property in that year.
>
> Thus, the FEA regulations by their specific language provide that only wells "which produce crude petroleum" are to be counted in calculating average daily production for the purpose of determining whether the stripper well lease exemption applies. While injection techniques help to "produce" crude petroleum, they are not wells which themselves "produce" crude petroleum. Therefore, wells which did not actually yield or produce crude petroleum during the preceding calendar year are not production wells for this purpose. Whether the non-producing well was an "injection" well, a disposal well, a dry well, a spent well or a shut-in well will not change this result.

**2.** In that case, the court included a comprehensive review of the history of the stripper well exemption but, because of the widespread interest in these cases, we find it useful and necessary to repeat much of that history here. *See also Southern Union Production Company v. Federal Energy Administration,* 569 F.2d 1147 (Em.App.1978).

It is submitted that Ruling 1974–29 is a reasonable interpretation of the term "average daily production" as used in § 406 of TAPAA, § 4(e)(2)(A) of EPAA, and in 10 C.F.R. § 210.32(b). As such it had no "impact" if such be a test. The "impact," if any, resulted earlier from the statute and from the regulation 10 C.F.R. § 210.32(b) found to be valid by the district court. The interpretation of § 406 of TAPAA and § 4(e)(2)(A) of EPAA to exclude injection wells in computing "average daily production" was a reasonable contemporaneous construction of the statute and created no new law or legislative rule.

589 F.2d at 1098.

Additionally, Judge Christensen, in his concurring opinion, wrote:

Notwithstanding some cross currents engendered by a considerable stirring of waters in the arguments, no significant impacts appear to operate against the ruling in question. And a holding that "a well which produces crude petroleum" means, as contemplated by the properly adopted and subsisting regulations and in view of the seminal statute, *a well that produces or yields such petroleum directly rather than one which may be utilized as a part of a system to obtain indirectly crude petroleum from a producing well, seems essentially the sort of an interpretation that must have been intended by the APA exception to the rulemaking requirement.*

589 F.2d at 1103 (emphasis supplied).

Following remand of these cases to the district court, the DOE filed with this court a petition for writ of mandamus directing the district judge to execute the mandate of our previous decision. It argued that *Energy Reserves I* definitively and conclusively established the validity of Ruling 1974–29, and the district court was without any authority to reach a different result. This court, with Judge Christensen now writing for a unanimous panel, denied the DOE's petition for the writ. *Duncan v. Theis,* 613 F.2d 305 (Em.App.1979). Recognizing that the previous mandate could pose some in-terpretation difficulties as to what exactly was decided and what was not, *id.* at 308, the court went on to declare:

It may well be beyond the issues thus clearly resolved by this court's decision on appeal that in line with Judge Becker's persuasive analysis and reasoning and as he has suggested, 589 F.2d at 1092, the administrative regulation and its interpretation constituted not only a reasonable construction of the statute as well, but in addition "may be the construction ultimately preferred by the courts." But since our decision did not definitely resolve any statutory problem, there is presently no basis to cut off further proceedings in the district court except for the mandated judgment sought by the petitioners.

*We deny the government's petition for a writ of mandamus because of the narrow reach of this extraordinary remedy, unresolved issues as to whether the ruling in question is arbitrary, capricious or unreasonable in the light of, or is in conflict with, or is beyond the authority granted by controlling statutory provisions,* the province and duty of the district court, consistent with the mandate of this court and the doctrine of *stare decisis,* to exercise its reasonable discretion in determining interlocutory proceedings, record making and judgments in the first instance, the consolidation and addition of parties plaintiff following the determination of the prior appeal and the issuance of the mandate of this court, and our confidence that Judge Theis upon this clarification of what we thought was manifest in our prior decision will not transgress the fair meaning and effect of our mandate or proper application of the doctrine of *stare decisis.*

*Id.* at 309 (emphasis supplied) (footnotes omitted).

Thus, while denying the petition for a writ of mandamus, the court expressed a rather strong belief that it had previously implicitly held Ruling 1974–29 to be valid in all respects. This is most clearly evidenced by footnote 4 which quotes approvingly

from Judges Becker and Christensen's opinions in *Energy Reserves I:*

Judge Becker expressly held that "Ruling 1974–29 is a reasonable interpretation of the term 'average daily production' as used in § 406 of TAPAA, § 4(e)(2)(A) of EPAA, and in 10 C.F.R. § 210.32(b), found to be valid by the district court." 589 F.2d at 1098. Judge Christensen clearly stated his agreement that no significant impact operated against the ruling in question because "a holding that 'a well which produces crude petroleum' means, as contemplated by the properly adopted and subsisting regulations and in view of the seminal statute, a well that produces or yields such petroleum directly rather than one which may be utilized as a part of a system to obtain indirectly crude petroleum from a producing well, seems essentially the sort of an interpretation that must have been intended by the APA exception to the rulemaking requirement." 589 F.2d at 1103.

*Id.* at 308 n.4.

To assist and guide the district court with respect to the merits of any outstanding issues, the court footnoted its decision with *Yablonski v. United Mine Workers of America,* 454 F.2d 1036 (D.C.Cir.1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972), wherein the Court of Appeals for the District of Columbia addressed a situation not unlike the situation presented here. In *Yablonski,* the issue was whether the district court had failed to give "full effect" to a previous mandate from the Court of Appeals. The court stated:

We had thought that the factual basis for our earlier decision was evident from the circumstances we cited as relevant, and its legal basis equally so from the principles we identified as controlling. By the same token, we believed that we had furnished the District Court with unequivocal standards which successor counsel ... would have to meet.

*Id.* at 1039, *quoted at* 613 F.2d at 309–10 n.10. After "recapitulating" their initial holding, the *Yablonski* court proceeded to grant the petition, adding:

[B]ut in the belief that issuance of a formal writ is unnecessary. We trade instead upon our confidence that without more the District Court will now take action to rectify the error which gave birth to the present proceeding.

454 F.2d at 1042, *quoted in* 613 F.2d at 309–10 n.10 (footnote omitted). In essence, *Duncan v. Theis* implicitly held that Ruling 1974–29 is valid but, rather than resorting to the extraordinary remedy of mandamus, left final determination of that question with the sound judgment of the district court.

Following the decision in *Duncan v. Theis,* the district court issued a lengthy opinion finding that 6 C.F.R. § 150.54(s) and subsequent similar regulations, as interpreted by Ruling 1974–29, are void and of no legal effect. *In Re Department of Energy Stripper Well Exemption,* 520 F.Supp. 1232 (D.Kan.1981). This single paragraph summarizes the district court's reasoning:

This Court therefore holds that the agency's decision to exclude injection wells from the well count for the purposes of determining average daily production was beyond the authority of the agency, and was contrary to the intent of Congress. The intent of Congress, as seen in the purpose and history of the measure, as well as the intent inferred through the application of appropriate canons of construction all indicate that injection wells should be counted. These considerations outweigh any deference due the agency's interpretation. Furthermore, as is explained and held in the following part of this opinion, the agency's action was arbitrary and capricious so as to completely obliterate any legal doctrine of deference.

*Id.* at 1265–66. On this appeal, we review the district court's finding of invalidity. More specifically, we examine whether the district court has correctly construed congressional intent; whether Ruling 1974–29 exceeds the authority of the DOE; and whether Ruling 1974–29 is arbitrary and capricious. We hold Ruling 1974–29 to be

valid and reverse the decision of the district court.

### Statutory and Regulatory History

Rapidly rising increases in world oil prices in 1973, accentuated by the Arab oil embargo, presented the United States with a serious inflationary problem. To halt the inflationary spiral in domestic oil prices, the Cost of Living Council (CLC), acting pursuant to the Economic Stabilization Act of 1970, Pub.L.No.91–39, 84 Stat. 796, 799, on August 22, 1973, issued its Phase IV system of price controls, setting up a two-tier price system on the first sale of all domestic production of crude oil.[3] Shortly thereafter, in two statutes enacted only eleven days apart, Congress expressly exempted from price controls oil produced from stripper well leases.

The stripper well exemption first appeared in the Trans-Alaska Pipeline Authorization Act (TAPAA) which was signed into law as Pub.L.No.93–153 on November 16, 1973. 87 Stat. 576, 584; 43 U.S.C. § 1651 *et seq.* Section 406 thereof reads as follows:

(a) The first sale of crude oil and natural gas liquids produced from any lease whose average daily production of such substances for the preceding calendar month does not exceed ten barrels per well shall not be subject to price restraints established pursuant to the Economic Stabilization Act of 1970, as amended, or to any allocation program for fuels or petroleum established pursuant to that Act or to any Federal law for the allocation of fuels or petroleum.

(b) To qualify for the exemption under this section, a lease must be operating at the maximum feasible rate of production and in accord with recognized conservation practices.

(c) The agency designated by the President or by law to implement any such fuels or petroleum allocation program is authorized to conduct inspections to insure compliance with this section and shall promulgate and cause to be published regulations implementing the provision of this section.

The Joint Statement of the TAPAA Committee of Conference explained the presence of the provision in the Alaskan Pipeline bill:

6. The Senate Bill had a number of miscellaneous provisions that were not directly related to oil pipeline rights-of-way. The House amendment had no comparable provisions. The Conferees' action was as follows:

\* \* \* \* \* \*

(c) The provision exempting the first sale of oil and gas from stripper wells from the price restraints of the Economic Stabilization Act of 1970, and from any allocation program, was adopted. A stripper well is defined as a well with an average daily production during the preceding month of not more than ten barrels. In order to qualify for the exemption the lease must be operating at a maximum feasible rate of production and in accord with recognized conservation practices.

TAPAA Conf.Rep.No.93–924, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Admin.News 2523, 2524 [hereinafter "TAPAA Conf.Rep."].

Eleven days later, on November 27, 1973, the President signed into law the Emergency Petroleum Allocation Act (EPAA), Pub. L.No.93–159, 87 Stat. 627, 15 U.S.C. § 751 *et seq.* That Act contained an almost identical exemption, but changed the qualifying period from the "preceding calendar month" to the "preceding calendar year." Section 4(e)(2) thereof provided:

(A) The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produc-

---

3. *See* 6 C.F.R. § 150, Subpart L (38 Fed.Reg. 22536 (1973)). Under this two-tier system, a ceiling price was placed on the volume of crude oil produced from a particular property equal to or less than the level of production from that property in the same month of 1972 (old oil). Crude oil produced in excess of 1972 levels and newly discovered oil (new oil) were free of controls.

ed in the United States from any lease whose average daily production of crude oil for the preceding calendar *year* does not exceed ten barrels per well.

(B) To qualify for the exemption under this paragraph, a lease must be operating at the maximum feasible rate of production and in accord with recognized conservation practices.

(C) Any agency designated by the President under section 5(b) for such purpose is authorized to conduct inspections to insure compliance with this paragraph and shall promulgate and cause to be published regulations implementing the provisions of this paragraph.

The only apparent mention of stripper wells in the legislative history of the EPAA appears in the Joint Explanatory Statement of the Committee of Conference.

(8) *Stripper wells.* The conference substitute contains a provision relating to stripper wells. This provision, found in section 4(e)(2) states that the regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well. In order to qualify for the exemption, a lease must be operating at the maximum feasible rate of production and in accordance with recognized conservation practices. Any agency designated by the President under section 5(b) of the conference substitute for such purpose is authorized to conduct inspections to insure compliance with this paragraph and shall promulgate and cause to be published requirements implementing the provisions of this paragraph.

EPAA Conf.Rep.No.93–628, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Admin.News 2688, 2699. However, in the legislative history of the TAPAA, Congress directed that in implementing the stripper well exemption, the administering agency was to "insure that the limited exemption of this class of wells for the express purposes described ... is not in any way broadened." TAPAA Conf.Rep. at 2532. To achieve this end, the conferees emphasized that they expected the administering agency to prevent manipulation "of lease units in a manner that evades the price control and allocation programs." *Id.* The conferees ordered the agency to make certain that:

[T]he exemption is narrowly defined and prudently administered, and to insure that the incentive being granted is properly limited in accord with congressional intent.

*Id.* at 2531 (emphasis supplied).

In order to implement the TAPAA stripper well exemption, the CLC, on November 21, 1973, issued a regulation which closely tracked the statutory language. 38 Fed. Reg. 32494 (1973); 6 C.F.R. § 150.54(s). "Stripper well lease" was defined therein as:

a "property" whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed 10 barrels per day during the preceding calendar month.

6 C.F.R. § 150.54(s)(2). "Average daily production" was defined as:

the qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar month, divided by a number equal to the number of days in that month times the number of *wells which produced crude petroleum* and petroleum condensates, including natural gas liquids, from that property in that month. To qualify as maximum total production, each well on the property must have been maintained at the maximum feasible rate of production, in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanial [sic] failure or other disruption in production.

*Id.* (emphasis supplied). After the EPAA was enacted, the definitions of "average daily production" and "stripper well lease" in the above regulation were amended on

December 12, 1973, to reflect the "calendar year" period of § 4(e)(2)(A) of the EPAA rather than the TAPAA's period of a "calendar month." *See* 38 Fed.Reg. 34464 (1973). The phrase "wells which produced crude petroleum" was unaffected.[4]

Section 4(e)(2)(C) of the EPAA authorized the President to designate any agency to promulgate and publish regulations implementing the EPAA. Pursuant to this grant of authority, Executive Order 11748 (38 Fed.Reg. 33575, December 6, 1973) was issued on December 4, 1973, which delegated the President's authority under the EPAA and the Economic Stabilization Act of 1970 to the Administrator of the Federal Energy Office. On December 11, 1973, the FEO issued a notice of proposed rulemaking which, *inter alia,* incorporated the provisions set forth in Part 150 of Title 6 of the Code of Federal Regulations, 38 Fed.Reg. 34434 (1973) (10 C.F.R. § 201.4), and excluded stripper well leases from the regulations. 38 Fed.Reg. 34416 (1973) (10 C.F.R. § 200.-2(a)). Final regulations were issued on December 27, 1973. 39 Fed.Reg. 744 (1974). In early 1974, 10 C.F.R. § 210.32 was issued. Section (b) thereof defined "Average daily production" in the same manner as in 6 C.F.R. § 150.54(s). *See* 39 Fed.Reg. 35510 (1974). It was subsequently amended on May 15, 1975, to read:

"Average daily production" means the qualified maximum total production of crude oil, including condensates, produced from a property, divided by a number equal to the number of days in the year times the number of wells that produced crude oil, including condensates, from that property in that year. To qualify as maximum total production, each well on the property must have been maintained at the maximum feasible rate of production, in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanical failure or other disruption in production.

40 Fed.Reg. 22124 (1975) (subsequent amendments to 10 C.F.R. § 210.32 at 40 Fed.Reg. 24517, 31927, 40820 and 52843 are irrelevant for purposes of this appeal).

The problem resulting from the issuance of these regulations is that nowhere, except possibly by implication, was the term "well" defined to exclude injection wells. The FEA interpreted the regulations to exclude injection wells from the well count in calculating "average daily production" per well. The industry strongly disagreed with this interpretation and argued that injection wells should be included in the well count because they were a necessary part of a secondary recovery system.[5] In response, the FEA, on December 19, 1974, issued Ruling 1974–29 which expressly excludes injection wells from the calculation of average daily production in determining the applicability of the stripper well exemption from the price control program. The following paragraph from the Ruling (quoted in its entirety in n.1, *supra*) concisely articulates the FEA's reasoning:

Thus, the FEA regulations by their specific language provide that only wells "which produce crude petroleum" are to be counted in calculating average daily production for the purpose of determining whether the stripper well lease exemption applies. While injection techniques help to "produce" crude petroleum, they are not wells which themselves "produce" crude petroleum. Therefore, wells which did not actually yield or produce crude petroleum during the preced-

---

**4.** On January 16, 1975, 6 C.F.R. § 150.54(s), along with other provisions of Chapters I, V and VI in Title 6, were adopted by the Department of Treasury. 40 Fed.Reg. 3572 (1975). Section 150.54 was effectively removed.

**5.** Through an injection well, fluids are forced into an underground oil reservoir to maintain reservoir pressure to help increase production of nearby producing wells. *See Wiggins Brothers, Inc. v. Department of Energy,* 667 F.2d 77,

80 (Em.App.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *Energy Reserves I,* 589 F.2d at 1105 (Zirpoli, J., dissenting). Inclusion of injection wells in the calculation of average daily production would enable a producer to divide his total production from a property by a greater number of wells, thereby allowing more production to qualify for the exemption by falling under 10 barrels per day per well.

ing calendar year are not production wells for this purpose. Whether the non-producing well was an "injection" well, a disposal well, a dry well, a spent well or a shut-in well will not change this result. This Ruling, here under challenge, has been consistently adhered to since first issued.

### Post-Enactment Developments

The stripper well lease exemption underwent a significant change not very long after its enactment. Section 401 of the Energy Policy and Conservation Act of 1975 (EPCA), Pub.L.No.94–163, 89 Stat. 871, 42 U.S.C. § 6201 *et seq.* and 15 U.S.C. § 751 *et seq.*, repealed the stripper well lease exemption of the EPAA and required the President to "establish ceiling prices" for stripper well production. FEA regulations were amended accordingly with 10 C.F.R. § 210.-32 deleted on February 1, 1976. 41 Fed. Reg. 4939 (1976).

Just eight months later, however, on August 14, 1976, Congress enacted the Energy Conservation and Production Act (ECPA), Pub.L.No.94–385, 90 Stat. 1125, 15 U.S.C. § 751 *et seq.* Section 121 thereof amended § 8 of the EPAA of 1973 by adding the following provision:

(i)(1) *The first sale price of stripper well crude oil shall be exempt from the regulation promulgated under section 4 of this Act* as amended pursuant to the requirements of this section.

\* \* \* \* \* \*

(2) For the purposes of this subsection, "stripper well crude oil" means crude oil produced and sold from a property whose maximum average daily production of crude oil per well during any consecutive 12-month period beginning after December 31, 1972, does not exceed 10 barrels.

(3) To qualify for the exemption under this subsection, a property must be producing crude oil at the maximum feasible rate throughout the 12-month qualifying period and in accordance with recognized conservation practices.

(4) The President may define terms used in this subsection consistent with the purposes thereof.

90 Stat. at 1133, 15 U.S.C. § 757(i) (emphasis supplied). On October 29, 1976, 10 C.F.R. § 212.54 was issued which provided in pertinent part:

"Average daily production" means the qualified maximum total production of crude oil (excluding condensate recovered in non-associated production) produced from a property, divided by a number equal to the number of days in the 12-month qualifying period times the number of *wells that produced crude oil* (excluding condensate recovered in non-associated production) from that property in that 12-month qualifying period. To qualify as maximum total production, each well on the property must have been maintained at the maximum feasible rate of production throughout the 12-month qualifying period and in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanical failure or other disruption in production.

\* \* \* \* \* \*

"Stripper well property" means a "property" whose average daily production of crude oil (excluding condensate recovered in non-associated production) per well did not exceed 10 barrels per day during any preceding consecutive 12-month period beginning after December 31, 1972.

41 Fed.Reg. 48323 (1976) (emphasis supplied).

As the language of these provisions demonstrates, Congress and the FEA refused to expand the stripper well exemption beyond its scope prior to being repealed. Congress did, however, address the growing importance of secondary recovery techniques. In doing so, it modified 15 U.S.C. § 757(d)(3)(C) which allowed for a special adjustment for production from marginal wells, including production from stripper wells, and lumped together all secondary recovery techniques, a category within which injection wells were intended to fall, for exemption purposes. *See* 15 U.S.C. § 757(j). The Conference Report to the ECPA explained this action as follows:

The conferees are agreed that there exists great potential for augmenting domestic crude oil production through the application of enhanced recovery techniques. There is also general agreement that current economic circumstances would permit adjustments to the pricing mechanism contained in the Energy Policy and Conservation Act to give needed additional incentives for the application of high-cost enhancement techniques which today are not economical. The conferees could not, however, agree to the provisions of the Senate amendment which would permit substantial price increases for commonplace secondary enhancement techniques such as water flooding and gas displacement. Moreover, the conferees did not believe it wise to attempt to create in rigid statutory language a special classification of domestic production which would be freed of price restraints. Unlike the case of stripper well production, for which there is both a long legislative and administrative history, there is not common agreement as to the practicality, feasibility or cost-effectiveness of the various enhancement techniques employed throughout the industry.

S.Conf.Rep.No.94–1119, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News 2027, 2047. Thus, as was recognized by Senator Jackson in later debate, *see* 123 Cong.Rec. 36059 (1977), Congress did provide in the EPAA a procedure by which a producer could obtain an exemption for the costs of secondary recovery techniques, including injection wells.

Senator Bartlett of Oklahoma, one of the principal architects and proponents of the stripper well exemption, who had on many occasions urged its expansion, stated in Senate debate on March 31, 1976:

In the Emergency Petroleum Allocation Act of 1973—EPAA—Congress voted overwhelmingly to allow stripper production to receive free market prices. The new pricing provisions of the EPCA place stripper and other categories of production under price controls. In this bill the definition of stripper production is ex-

panded to include marginal production other than from wells producing less than 10 barrels per day. This additional marginal well category includes production from high watercut wells, from some deeper and offshore wells producing in excess of 10 BPD, and from marginal fluid injection projects.

122 Cong.Rec. 8757 (1976). In the Senate version of that "bill" he mentions, S. 3233, injection wells were included, with a proposed amendment to § 8 of the EPAA to include the following provision as (i)(3):

To qualify for the exemption under this subsection a property must be producing crude oil at the maximum feasible rate and in accordance with recognized conservation practices, and if injection wells are to be counted to determine the number of wells for a property, the injection wells must be injecting into the crude oil producing reservoir and the injection operations must have been initiated according to sound engineering principles for the purpose of increasing ultimate recovery or the producing rate of crude oil from the property.

*Id.* at 8758. The Senate and House conferees failed to accept that Senate amendment. It is obvious from the final measure enacted by Congress, that Senator Bartlett did not succeed in obtaining the "expanded" interpretation he sought. Congress decided to maintain the scope and nature of the stripper well exemption just where they were prior to being eliminated by the EPCA.

Following a public hearing on September 22, 1976, the FEA, on October 29, 1976, adopted a stripper well exemption again substantially similar to the previous regulations. That regulation is quoted earlier in this opinion at pages 17–18. 41 Fed.Reg. 48323 (1976). The stripper well exemption was placed in essentially the same position it was in prior to being repealed. Senator Bartlett's efforts to obtain an expanded exemption were unsuccessful. Nonetheless, he vigorously continued to seek to amend the established law to include injection wells in the well count. The most impor-

tant act by Senator Bartlett for purposes of this appeal occurred in the fall of 1977.

On October 31, 1977, during Senate debate on a bill to extend the life of the EPAA of 1973, Senator Bartlett offered an amendment (No. 1502) to the EPAA of 1973 "to clarify the intent of the 'stripper well' amendment." 123 Cong.Rec. 36058 (1977). His amendment provided that injection wells would be counted, together with producing wells, to determine the stripper well status of a lease. His amendment read as follows:

> Sec. . Section 8(i)(2) of the Emergency Petroleum Allocation Act of 1973, as amended, is amended by adding the following new sentence at the end thereof: "Including in the count of the total number of wells on a property shall be all wells producing crude oil and all wells utilized for the purpose of injecting water and or other materials into a producing reservoir for the purpose of enhancing crude oil recovery."

*Id.* A lively debate ensued with the vast majority of speakers in favor of the amendment. Senator Bartlett stated:

> First, let me approach the cost question this way.
>
> In looking at the producing well alone, the costs involved of the small producer are those costs of just producing that well, operating the pumping unit, presumably, keeping in good shape the lead line to the tank, keeping the property cleaned up, and the normal expenses, pulling the well occasionally, and so on.
>
> The cost of operating an injection well in a waterflood is roughly the same as that for a producing well.
>
> So for a stripper waterflood to be treated fairly under the stripper well amendment, we should, therefore, count the injection wells as oil wells for the purpose of qualifying.

*Id.* Senator Tower stated:

> The inclusion of injection wells in the computation of a property's barrels-per-day average per well, for purposes of the stripper oil exemption, would be a natural and beneficial change. It would be a

change which would make the law more reasonable and less arbitrary. Most important, it would add significantly to the Nation's supply of domestic crude oil by extending the economic life of many older, developed oil fields.

*Id.* at 36061. Senator Bellmon stated:

> Mr. President, very briefly, I would simply like to say I consider it to be senseless not to permit the counting of injection wells when determining average daily production. If these are not oil wells in the strict sense of the word, they are certainly essential to oil production. I felt, when we passed the stripped well amendment initially, they would be included. The Interior Department has long counted injection wells.

*Id.* Senator Dole stated:

> This amendment would let producers count both the producing wells and the injection wells when he is calculating the number of barrels per well that he produces from the property.
>
> I think this would certainly be fair. While these injection wells are very costly, they produce no oil of their own and thus they produce no profits for the producer. Yet, without them there would be no production from such a property at all. They deserve to be counted as part of the total number of wells on the property.

*Id.* at 36062. And Senator Bumpers stated:

> I had some reservations about the amendment, because I felt there was some serious potential for abuse here in drilling these salt injection wells in order to get the upper tier price of the stripper price, the decontrolled price. But I talked with the people in my State who are in this business. Virtually all the oil produced in my State is stripper oil, and they tell me that as a practical matter, this is not likely to be abused, because these wells are expensive to drill and to maintain, and that any figure we establish here of the number of wells that can be used in terms of the formula will be highly arbitrary.

*Id.* at 36063. The only speaker opposed to the amendment was Senator Jackson, who argued:

Mr. President, I oppose this amendment and urge that it be defeated.

The proponents are arguing here, in effect, that it clarifies the intent of the so-called stripper well amendment. Mr. President, I supported the original exemption from price controls for the so-called stripper wells.

I point out that the language of the existing law expressly refers to wells producing crude oil. It does not include injection wells, nor was it intended to. The effect of the amendment would be to expand the number of crude-oil producing properties which are exempt from price controls.

The Department of Energy indicates that it is unable to determine the amount of production that would be decontrolled. It is even more difficult to determine whether and to what extent the amendment would yield any additional production over and above that which is already stimulated by the current exemption for stripper wells.

Much of the oil to which the amendment would apply is old oil which was discovered several years ago. The amendment—so that we all understand—would allow the price to jump from $5.25 to almost $14 over night. I see no justification for this $9 per barrel windfall.

Mr. President, in connection with the colloquy between the distinguished Senator from Colorado (Mr. Hart) and the distinguished Senator from Oklahoma (Mr. Bartlett), I point out that the existing law, the Emergency Petroleum Allocation Act, does provide a procedure by which the producer can, in fact, get an exemption for secondary recovery, including injection wells. In response to the question posed by the Senator from Colorado, the hitch is that these producers must demonstrate that the cost justifies the price. So the procedure is there. If the producer can justify the price, then an exemption can be had under the existing law.

Mr. President, I feel very strongly that we must provide additional incentives to bring out the so-called hard-to-get oil, where the cost can be demonstrated to be a factor that warrants price adjustment. I think that is what we all seek. But should you turn around and grant a $9 per barrel increase where you cannot even come close to justifying that kind of a price exemption?

*Id.* at 36059.

Senator Bartlett's amendment was approved by the Senate by a final vote of 62–24. *Id.* at 36063. The House version contained no such provision. The final conference agreement also did not include this provision. *See* Joint Explanatory Statement of the Committee of Conference, *reprinted at* [1978] U.S.Code Cong. & Admin. News 8071, 8087.

### Congressional Intention

■ After reviewing the history of the regulations and Ruling 1974–29, the district court concluded that the exclusion of injection wells conflicts with congressional intent. The primary reason articulated by the district court appears to be that excluding injection wells from the count would run contrary to the purpose of encouraging "the operation of marginally productive wells to produce oil that otherwise would not be produced." 520 F.Supp. at 1258. There is no question that continued production from stripper wells was the paramount result sought from the exemption. Without it, the continued operation of many such wells would become economically infeasible and would have to be shut down. In a period of oil shortage, reduced domestic production was not desired. Despite this laudable objective, the Congress and the FEA both realized that the exemption also carried with it a real potential for abuse. The financial benefits to well operators to have their leases declared "stripper well" was an enormous incentive for manipulation of the exemption. The President and Congress vested with the FEA broad authority to prevent such abuses. Prevention

of such abuse and manipulation is one of the reasons for Ruling 1974–29. This concern is evident throughout the history of the exemption. It is most evident in the TAPAA Conference Report which provides:

15. Section 406, relating to stripper oil wells, was a Senate floor amendment to S. 1081. The Conferees have adopted the general concept of the floor amendment, but have added new provisions to insure that the exemption is narrowly defined and prudently administered, and to insure that the incentive being granted is properly limited in accord with congressional intent.

\* \* \* \* \* \*

The Congress intends that the provisions of this section will be strictly enforced and regulated by the administering agency to insure that the limited exemption of this class of wells for the express purposes described above is not in any way broadened. To achieve this, Congress authorizes on-site inspections to insure compliance. Congress also directs that the administering agency shall promulgate regulations to implement the provisions of this section before it becomes operative. The Conferees expect the administering agency to utilize State data regarding production volumes, and to provide by regulation safeguards against the manipulation of gerrymandering of lease units in a manner that evades the price control and allocation programs.

These regulations shall be so designed as to provide safeguards against any abuse, over-reaching or altering of normal patterns of operations to achieve a benefit under this section which would not otherwise be available. Congress specifically intends that the regulations shall, among other things, prevent any "gerrymandering" of leases to average down high production wells with a number of low production stripper wells to remove the high production wells from price ceilings. The *sole* purpose and objective of this Section 406 is to keep stripper wells—those producing less than ten

barrels per day—in production and to insure that the crude oil they produce continues to be available for U.S. refineries and U.S. consumers. It is not intended to confer any benefit on the owners and operators of wells producing in excess of ten barrels per day.

The Congress also intends that the regulations provide appropriate limitations and provisions in the definition of "lease" to insure that an administratively workable system is established which does not permit abuse.

TAPAA Conf.Rep. at 2531–33. A failure on the part of FEA to take action would have been a breach of its assigned responsibility to eliminate the potential for abuse. Injection wells were an area of possible abuse and the FEA acted accordingly. Their exclusion was within the scope of congressional intent and agency authority. *See Grace Petroleum Corp. v. Department of Energy,* 456 F.Supp. 945, 949–50 (W.D. Okla.1978).

Another important factor to consider is the original intended scope of the exemption. At the time the stripper well exemption was first enacted in 1973, it was clear to Congress that a relatively small percentage of this country's total oil production would be affected. Congress was legislating an exemption from price controls for only that "11.2 per cent of our domestic oil production," 119 Cong.Rec. 23873 (1973), or that "very small percentage of the crude that is available for refining purposes." *Id.* at 23876. Even the strongest proponents of the exemption recognized the rather limited scope of the exemption. During Senate debate of the TAPAA, Senator Bartlett stated that:

A stripper well is a low productivity, marginally economic well. It can produce just enough oil to remain above the break-even point. By definition a stripper well averages 10 barrels of oil per day or less. These wells provide 1.25 million barrels of oil per day.... In 1972, stripper wells accounted for 11.2 per cent of our domestic oil production.

119 Cong.Rec. 23873 (1973). During that same debate, Senator Cook of Kentucky stated:

> I do not think there is any question about the fact, if we are talking about stripper wells with production of 10 barrels a day and less, that we are talking about a very small percentage of the crude that is available for refining purposes.

*Id.* at 23876. It is obvious from the congressional debates on the TAPAA and the EPAA that the exemption was to have a narrow range of applicability. Any broader exemption would render the price controls on oil practically meaningless. Interestingly, nowhere in the statutes or the governing Conference Report is there to be found even a mention of injection wells.

The appellees in this case admit that they seek an exemption which would have an impact far in excess of that ever contemplated by Congress. During oral argument, their counsel stated:

> In 1973 and for many, many years, secondary recovery of oil, which is what we are dealing with here, constituted 30 to 50% of this nation's oil production. The evidence in the record is that in 1973 alone secondary recovery by means of waterflood operations, accounted for over one billion barrels of oil being produced in this country, and for an agency which is regulating oil production to say that they were not required to foresee how that regulation would impact on one half of the production that they are regulating is absolutely ludicrous.

The amount of oil subject to the exemption under appellees' interpretation is much greater than originally anticipated and intended. Such an expansion might very well have been desired by Congress under the oil market conditions which prevailed following enactment. But such an interpretation on our part would conflict with the clear intention expressed when the exemption was first created. If an expansion in coverage was intended to include injection wells in the count, it was for the legislature and not this court to now do so.

From 1973 to 1977, the FEA applied a single and unequivocal interpretation of the stripping well regulations. Even after the exemption was repealed and reenacted, Congress did not choose to modify Ruling 1974–29 even though it had the opportunity to do so. While the district court practically ignored this fact, we consider it a significant and probative indication of Congress' approval of Ruling 1974–29.

▮ When we add to that the fact that the Conference Committee on the Energy Tax Act of 1978 (Pub.L.No.95–618, 92 Stat. 3174) refused to accept the Bartlett amendment contained in the Senate version of the bill, which amendment would have amended the definition of stripper oil to include water and other injection wells in computing the average daily production per well, we are presented with clear and convincing evidence that Congress intended to include only "wells that produced crude petroleum" when it enacted and reenacted the stripper well exemption. We also cannot help but recognize that prior to the reenactment of the stripper well exemption in the ECPA, the EPAA had been extended three times without disturbing or modifying Ruling 1974–29. *See* Pub.L.No.93–511, 88 Stat. 1608 (1974); Pub.L.No.94–99, 89 Stat. 481 (1975); Pub.L.No.94–133, 89 Stat. 694 (1975). By these actions, we believe Congress spoke loudly, clearly and unequivocally that its intention was not to enlarge or expand upon the "narrowly defined and prudently administered" exemption which it had originally mandated in the TAPAA Conference Report.

### "Arbitrary and Capricious" Finding

▮ As an alternative holding, the district court concluded that the exclusion of injection wells was arbitrary, capricious and an abuse of discretion. This paragraph summarizes the court's position on this issue:

> Based on this undisputed record, the Court must conclude that to the extent that the regulation excludes injection wells from the well count, it was issued in a manner which was arbitrary, capricious,

and a gross abuse of discretion. The record discloses that the exclusion contained in the regulation was not the result of any semblance of reasoned decision making, but rather was the result of happenstance, and an unintended construction of language contained in the regulation. The agency failed to consider any factors which could be deemed relevant. The agency failed to consider any facts. The agency did not consider whether excluding injection wells would further or hinder the congressional purposes underlying the stripper well exemption. Bluntly stated, neither ignorance of the subject matter nor vacuity of thought processes can amount to consideration as a thought process accomplishment of a government agency. The agency's process in arriving at the regulatory exclusion of injection wells must be deemed "arbitrary" under. any construction of that word.

520 F.Supp. at 1272 (footnote omitted). It is obvious from a reading of the court's opinion that it simply disagreed with the FEA's interpretation of the stripper well exemption regulation. But disagreement is not the standard of review to be applied. The district court has misapplied the correct standard of review in reaching its decision and misconstrued existing precedent. The most appropriate place to begin is with this court's two previous decisions in this matter.

*Energy Reserves I and Duncan v. Theis*

Neither of our previous decisions in this matter expressly ruled on the validity of Ruling 1974–29. Nevertheless, the discussion of the court in each case fully establishes the error of the district court's decision. In *Energy Reserves I,* Judge Becker stated that:

> The interpretation of § 406 of ·TAPAA and § 4(e)(2)(A) of EPAA to exclude injection wells in computing "average daily production" was a *reasonable contemporaneous construction* of the statute and created no new law or legislative rule.

589 F.2d at 1098 (emphasis supplied). Judge Becker also added:

> There is no fundamental unfairness in the application of Ruling 1974–29 because it is a *reasonable interpretation* of the stripper well exemption of EPAA, TAPAA and the regulation 10 C.F.R. § 212.-32(b).

*Id.* at 1101 (emphasis supplied). And in his concurring opinion, Judge Christensen importantly expressed his view that:

> And a holding that "a well which produced crude petroleum" means, as contemplated by the properly adopted and subsisting regulations and in view of the seminal statute, a well that produces or yields such petroleum directly rather than one which may be utilized as a part of a system to obtain indirectly crude petroleum from a producing well, *seems essentially the sort of an interpretation that must have been intended by the APA exception to the rulemaking requirement.*

*Id.* at 1103 (emphasis supplied).

In *Duncan v. Theis, supra,* we sought to reemphasize our views as we remanded the case to the district court for its determination of those enumerated remaining issues. We stated:

> In sum, the present situation is that the consistency of Ruling 1974–29 with the APA has been finally established and, in connection with the ruling on the issue before the court and particularly in dealing with the question of substantial impact, both judges concurring in the result clearly indicated the majority view that the ruling in question did not represent any substantial departure from the meaning of the regulation, and for this reason had no substantial impact as an interpretive ruling. Whether the regulation itself was within the authority of the FEA to promulgate, despite its conceded procedural regularity, or whether it was arbitrary or capricious does not so clearly appear from a consideration of the decision as a whole.
>
> The unjustified unwillingness of the government on the one hand to acknowledge this differentiation in its effort to block all further proceedings before

Judge Theis by way of discovery or otherwise, and on the other hand the mistaken position of some of the plaintiffs that our decision essentially settled nothing, or at most only the issue of "procedural validity" as affecting the parties involved in the appeal, may account in some measure for the difficulties the lower court and the parties now profess to see within our mandate. Yet, it was rendered clear during the oral argument on the petition for mandamus now before us that the decision of this court set at rest the question of the compliance of the ruling in question with the APA because it was simply a restatement of the meaning and effect of the regulation on which it was based. 613 F.2d at 308 (footnotes omitted). In an effort to avoid any misunderstanding regarding the specific reason for our denial of the petition for mandamus relief, we wrote:

In so withholding the peremptory writ we do not mean to be understood as accepting or suggesting that the binding meaning and effect of the mandate is limited to express or formally mandatory language as distinguished from its reasonable meaning, spirit and effect in context of the decision agreed upon by the majority of the judges of the court, that our decision, even though involving the main, concurring and dissenting opinions, is not mandatory and binding upon remand in the light of context, spirit, unity of opinion and reasonable effect, that as to refiners who were not parties to the appeal, but who are now before the same court in essentially the same position as those who were, the doctrine of *stare decisis* is not controlling upon the district court, nor that interlocutory injunctions or discovery programs inconsistent with a mandate or repugnant to a proper application of the doctrine of *stare decisis* are beyond the reach of a peremptory writ or other remedy.

*Id.* at 310–11 (footnotes omitted). Thus, while not expressly holding that Ruling 1974–29 is fully valid, there should have been no serious doubt that the court believed such was the case. Contrary to the belief of Judge Theis that the panel in *Energy Reserves I* was merely "sounding off," *see* 613 F.2d at 310 n.11, the discussion and analysis of all three judges, while not binding on other courts, represent authoritative interpretations of Ruling 1974–29. They speak all too clearly on the very issue the district court was asked to decide.

This view, as well as our final holding in these cases, is completely supported by this Court's recent decision in *Wiggins Brothers, Inc. v. Department of Energy,* 667 F.2d 77 (Em.App.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982), a case practically on all fours with this case. The issue there was "simply whether, under a proper construction of the Marginal Property Rule [10 C.F.R. § 212.72 (as amended effective June 1, 1979)], injection wells may be counted 'as wells that produced oil.'" *Id.* at 87. Just as is the case here, the regulation fails to define the key phrase "wells that produced oil." The district court construed this phrase as including injection wells based upon its "plain meaning." *Id.* at 81–82. In reaching that decision, the district court gave considerable weight to the industry's interpretation as well as the treatment which had been given injection wells by other energy regulatory bodies. *Id.* at 82. The district court also disregarded the preamble to the rule in favor of the rule's plain meaning. *Id.* That preamble, published in the Federal Register, incorporates Ruling 1974–29, the centerpiece of this appeal.

Writing for this court in *Wiggins,* Judge Becker concluded "that injection wells may not be counted as 'wells that produced oil' in the applica. i of the Marginal Property Rule." *Id.* at 87. Paramount in the court's reasoning was the "clearly expressed" and "obvious intention" of the DOE to exclude injection wells from the count. Ruling 1974–29 was found to be controlling as well as a definition of "average daily production" which specified that it "must be determined in the same way as it is done for stripper well properties, and the provisions of the relevant stripper well property rulings will be applicable...." *Id.* at 87. The opinion makes undeniably clear that

the Marginal Property Rule is to be interpreted in the same manner as the stripper well exemption which the court correctly understood as excluding injection wells. In three separate passages, the court found dispositive our earlier rulings in *Energy Reserves I* and *Duncan v. Theis, supra.*

Finally, the prior decisions construing the interpretative stripper well Ruling 1974–29 to be consistent with a similar underlying statute are decisive. *Energy Reserves Group, Inc. v. DOE,* 589 F.2d 1082 (Em.App.1978), clarified in *Duncan v. Theis,* 613 F.2d 305 (Em.App.1979). 667 F.2d at 89.

The critical phrase "average daily production" had earlier acquired a meaning by administrative interpretation in Ruling 1974–29 that excluded injection wells in calculating whether average daily production was 10 barrels or less for the purpose of the statutory stripper well lease exemption and regulation 10 C.F.R. § 210.32(b) (the latter of two consistent implementing regulations). *Energy Reserves Group, Inc. v. DOE,* 589 F.2d 1082 (Em.App.1978), clarified in *Duncan v. Theis,* 613 F.2d 305 (Em.App.1979).

*Id.*

The reported practices and interpretations of state regulatory commissions and the Department of Interior for other purposes, relied on by the District Court, are not effective to rebut the contrary meaning and administrative interpretation of the Marginal Property Rule by DOE. This was expressly held in *Energy Reserves Group, Inc. v. DOE,* 589 F.2d 1082, at 1098–1099 (Em.App.1978), clarified in *Duncan v. Theis,* 613 F.2d 305 (Em.App. 1979).

*Id.* at 90. While the district court below experienced difficulty in understanding the interpretations given Ruling 1974–29 in *Energy Reserves I* and *Duncan v. Theis,* this court in *Wiggins* did not. We agree with *Wiggins'* analysis of Ruling 1979–29 and conclude that injection wells are not to be counted for purposes of the stripper well exemption. The agency's interpretation of the stripper well is neither "plainly errone-

ous [n]or inconsistent with the regulation." *Wiggins,* 667 F.2d at 88 (cites omitted).

### Justification for Ruling 1974–29

The district court attacked with unrestrained vigor the reasonableness of Ruling 1974–29. 520 F.Supp. at 1272–73. In its view, there was no logical reason for distinguishing injection wells from producing wells. We note the district court's reliance on industry practices in reaching its decision, but under the "arbitrary and capricious" standard we must apply, we do not believe Ruling 1974–29 is invalid for several reasons.

The most important reason has already been articulated. Including injection wells in the count could possibly lead to a serious abuse of the purposes of the exemption. A lease operator could be encouraged to convert old abandoned wells or to drill additional injection wells to obtain the benefits of the exemption. The financial benefits resulting from the exemption of an entire leasehold from price controls could significantly exceed the costs of the injection wells. This scenario was surely not desired by Congress. It would be grossly unfair to suggest that injection wells would spring up all over the country if injection wells were included in the well count, but it is not unreasonable to suggest that such a result could occur. Ruling 1974–29 eliminates any potential for such abuse. Perhaps it could be considered an extreme measure but it is not arbitrary or capricious.

The core of appellees' argument is that injection wells are "wells that produced crude oil" under the regulation. A plain reading simply does not support that conclusion. At minimum, a reasonable reading would distinguish injection from producing wells. *See Grace Petroleum, supra,* 456 F.Supp. at 949. An injection well is a secondary recovery technique, and such techniques were not considered by Congress when creating the exemption and drafting the language of the statutes. Congress had numerous opportunities to modify the exemption to include injection wells in the count but consistently refused to do so.

For the court to interpret the language to include them would constitute a flagrant disregard of a clear and contrary congressional intention.

The district court's error in its decision is its total reliance on production incentives. It fails to adequately weigh the other side of the coin. Price controls on oil was the fundamental purpose of the legislation. It is obvious that Congress in no way intended to create an opportunity for mass evasion of those controls. The stripper well exemption was designed as an extremely limited and narrow exemption, and the DOE interpretation gives full effect to this intent. There is no reason in this case not to give the agency's own construction of its regulation great deference, *see Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391 (Em.App.1975), especially so here inasmuch as we find the agency's interpretation reasonable. *Energy Consumers and Producers Association, Inc. v. Department of Energy,* 632 F.2d 129 (Em.App.), *cert. denied,* 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980). We are not the legislative body responsible for this nation's energy policies. The wisdom or lack thereof of Ruling 1974–29 is properly left with the Congress. Our review is a narrow one and we will not unnecessarily and improperly intrude upon the public policy decisions made by the other branches of Government. Simply stated, there is nothing about Ruling 1974–29 which renders it arbitrary or capricious. It reasonably attempts to effectuate the congressional policies expressed throughout that body's numerous efforts to formulate and implement an effective national energy policy.

### Conclusion

In summary, we find:

1) The legislative history of the stripper well exemption amply supports the DOE's position that injection wells were not intended by Congress to be included in the well count;

2) Ruling 1974–29 is not beyond the authority of the DOE granted by the controlling statutory provisions;

3) Our prior decision in *Energy Reserves I, Duncan v. Theis* and *Wiggins* have correctly decided that Ruling 1974–29 is a reasonable interpretation of the applicable statutes and regulations; and

4) The stripper well regulations, as interpreted by Ruling 1974–29, are neither arbitrary nor capricious.

For all these reasons, the decision of the district court is reversed, and these consolidated cases are remanded to the district court with instructions to enter judgment for the defendants-appellants.